383 A.2d 1228

**In re WILLIAM L., Frank L., and Mark L., minor children.**

**Appeal of MARJORIE L.**

**In re JUDITH DENISE B., a minor.**

**Appeal of GLADYS B.**

Supreme Court of Pennsylvania.

Argued April 21, 1977.

Decided Jan. 31, 1978.

Warren R. Baldys, Jr., Williamsport, for appellant.

Charles F. Greevy, III, Williamsport, for appellee, Lycoming County Children's Services in both cases.

Robert P. Kane, Atty. Gen., for appellee, Commonwealth of Pennsylvania.

Greevy, Greevy & Greevy, Williamsport, for appellee, Lycoming County Children's Services in No. 113.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

These are appeals from final decrees of the Orphans' Court Division of the Court of Common Pleas of Lycoming County terminating the parental rights of appellant Gladys B. to her daughter Judith Denise B. and of appellant Marjorie L. to her three sons William L., Mark L., and Frank L.[1] Appellee, in both appeals, is Lycoming County Children's Services [Children's Services]. The parental rights of both appellants were terminated pursuant to section 311(2) of the Adoption Act of 1970.[2] In addition to challenging the suffi-

1. We hear these appeals pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1977).

2. Act of July 24, 1970, P.L. 620, § 311(2), 1 P.S. § 311(2) (Supp.1977). Section 311(2), for which there was no corollary provision in the previous Adoption Act, authorizes termination of parental rights when:

"The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental

ciency of the evidence to support the decrees entered in their respective cases, both appellants claim that section 311(2) is vague, in violation of the due process clause of the fourteenth amendment. They also assert that section 311(2), as applied to them, deprives them of their interest in maintaining their parental relationships protected by the first, ninth, and fourteenth amendments to the United States Constitution. Because of the substantial similarity of these claims, we agreed to hear and decide the two cases together. We affirm in both appeals.

I. SECTION 311(2) OF THE 1970 ADOPTION ACT IS NEITHER UNCONSTITUTIONALLY VAGUE NOR VIOLATIVE OF SUBSTANTIVE DUE PROCESS AND MAY CONSTITUTIONALLY BE APPLIED TO TERMINATE APPELLANTS' PARENTAL RIGHTS.

■ Every presumption is in favor of the constitutionality of legislative acts, Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(3) (Supp.1977), and statutes are to be construed whenever possible to uphold their constitutionality. *Bentman v. Seventh Ward Democratic Executive Committee*, 421 Pa. 188, 218 A.2d 261 (1966). "Courts may not declare a statute unconstitutional 'unless it *clearly, palpably,* and *plainly* violates the Constitution.'" *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 16, 331 A.2d 198, 205 (1975), quoting *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A.2d 835, 840 (1963). Appellants' constitutional challenges do not meet this stringent burden.

■ Appellants both assert that section 311(2) of the Adoption Act is unconstitutional unless given a narrowing interpretation precluding its application to terminate their respective parental rights. They assert that parents have a fundamental interest in continued association with their children protected by the United States Constitution. They contend that section 311(2) violates this interest unless inter-

care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent."

preted to require two showings before parental rights may be terminated: (1) that the parent has demonstrated a "high and substantial degree of misconduct;" and (2) that the child, while in the parent's custody, has suffered substantial physical or mental harm because of the absence of a basic need such as food, clothing, shelter, or medical care. Appellants contend that, absent such a narrow interpretation, the phrase "has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being" in section 311(2) is unconstitutionally vague because it is susceptible to arbitrary enforcement and fails to give adequate notice to parents of the conduct required of them. We do not agree. Section 311(2) is not unconstitutionally vague and may constitutionally be applied to terminate parental rights where, as here, the record establishes "the repeated and continued incapacity" of a parent to provide the child with the "essential parental care, control, or subsistence necessary for his physical or mental well-being." [3]

A. Section 311(2) is not unconstitutionally vague because the language of the section and the decisions of this Court interpreting section 311(2) provide sufficiently precise guidelines to ensure reasonable notice and proper application.

■ Vague statutes may offend the Constitution in three ways: (1) they may trap the innocent by failing to give a person of ordinary intelligence reasonable opportunity to know what is prohibited so that he may act accordingly; (2) they may result in arbitrary and discriminatory enforcement in the absence of explicit guidelines for their application, and (3) where they implicate first amendment freedoms, they may inhibit constitutionally protected activity. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). Appellants argue that the language "has caused the child to be without essential

3. The Attorney General was notified of the constitutional challenge to section 311(2) raised in these appeals, as prescribed by Pa. R.A.P. 521.

parental care, control, or subsistence necessary for his physical or mental well-being" in section 311(2) presents all three dangers. See *Alsager v. District Court of Polk City, Iowa*, 406 F.Supp. 10 (S.D.Iowa 1975), aff'd in part, 545 F.2d 1137 (8th Cir. 1976).

Considering first the question of notice, we believe appellants misperceive the nature of section 311(2). Unlike the typical statute attacked on vagueness grounds, section 311(2) does not prohibit or regulate any particular conduct.[4] Section 311(2) is concerned only with the welfare of children whose essential needs have not been met, and whose parent cannot or will not meet those needs in the future. In the instant cases, the basis for termination is several years of demonstrated parental incapacity, which does not involve parental misconduct. When a statute attaches consequences to parental incapacity, a requirement that the statute "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), serves no purpose, because the statute applies only to a parent incapable of conforming conduct to avoid the effect of the statute.

Of course, the other bases for termination relate to parental neglect, abuse, or refusal to meet the child's essential needs and thus involve parental misconduct. Section 311(2), however, requires that, before parental rights may be terminated, the court must find that the "conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent." 1 P.S. § 311(2) (Supp.1977). This requirement excludes the possibility that parental rights will be terminated because of insufficient notice, since the parent's inability or unwillingness to meet the child's essential needs must be affirmatively demonstrated. The requirement that parental conduct resulting in termination

4. Legislation prescribing any particular mode of child rearing would likely be unconstitutional. See *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

of parental rights be irremediable negates appellants' notice argument.[5]

Second, section 311(2) does not create the potential for arbitrary and discriminatory enforcement. The language of section 311(2) is broad and speaks in general terms, as do most statutes concerned with neglect.[6] However, our strong policy protecting the family from unwarranted state intrusion protects against arbitrary or discriminatory applications of section 311(2).

When the child is in the home, this on-going relationship will not be disturbed except upon a showing by clear and convincing evidence that removal is "clearly necessary." *Adoption of R.I.*, 468 Pa. 287, 294, 361 A.2d 294, 297 (1976); *Interest of Larue*, 244 Pa.Super. 218, 366 A.2d 1271, 1275 (1976). It is not enough to justify termination of parental rights under section 311(2) to demonstrate that the home is "submarginal" and likely to result in a "cultural

5. When termination is sought on the basis of parental conduct causing the child to be without essential parental care, the requirement that the conduct be shown to be irremediable could be met rarely, if ever, absent evidence that the deficiencies in parental conduct had been identified, and the parent was nonetheless unwilling or unable to modify the conduct to remedy the situation. Moreover, because of the Commonwealth's commitment to the preservation of the family, when termination is sought by an agency, a normal element of the agency's proof will be that services have been made available to the parent to help remedy the causes of removal and have proved unavailing. See *Adoption of R.I.*, 468 Pa. 287, 295 n.9, 361 A.2d 294, 298 n.9 (1976). We need not decide whether such a showing is required in light of the Commonwealth's public policy, since it is clear that both appellants have received years of assistance from Children's Services and related public agencies. See section II, infra.

6. See, e.g., Cal. Welf. & Inst. Code § 600 (West 1972).
 Many commentators believe that, because of the many different circumstances which may justify intervention, general language is necessary in statutes authorizing intervention in the parent-child relationship. E.g., Katz, When Parents Fail 64 (1971) ("[Broad] neglect statutes recognize that 'neglectful' behavior can also vary, and thus cannot be easily or specifically defined. . . . The broad neglect statutes allow judges to examine each situation on its own facts."); Levine, Caveat Parens: A Demystification of the Child Protection System, 35 Pitt.L.Rev. 1, 17 (1973).

deprivation." *In re Geiger,* 459 Pa. 636, 640, 331 A.2d 172, 174 (1975). These decisions render agency officials power-less to remove a child from parental care and control absent a clear showing that the child either has been subjected to abuse or suffered serious harm, or that the threat of such harm is real and substantial and cannot be alleviated by means less drastic than removal.

■ Often, as in these appeals, the question of whether to terminate parental rights arises long after the unity of the family has been disrupted by separation of the child from the parent. Marjorie L's three sons have been in foster care since 1971; Gladys B's daughter Judith has been in foster care since 1974. Extended relegation of a child to the care of others as a result of parental incapacity or neglect is relevant in determining whether the child has been without essential parental care or control. See *Rothstein v. Luther-an Social Services of Wisconsin and Upper Michigan,* 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972); cf. *In re Smith's Adoption,* 412 Pa. 501, 194 A.2d 919 (1963) (that natural mother allowed foster parents to meet child's physi-cal and mental needs for over a year was relevant to termination of parental rights). A stable family relationship is "necessary for [a child's] physical or mental well-being." "Continuity of parental affection and care provides the cornerstone for the child's sense of self worth and security; parental discipline and example develop the wellsprings of values and ideals." Note, In the Child's Best Interests: Rights of the Natural Parents in Child Placement Proceed-ings, 51 N.Y.U.L.Rev. 446, 450 (1976). The essential need of a child for close and continuous association with a parent or parent-figure is well recognized in psychological literature. See sources cited in id. at 449–51.

■ Accordingly, when a child has been placed in foster care, a parent has an affirmative duty to work towards the return of the child. See *Involuntary Termination of Paren-tal Rights of S.C.B. and K.T.,* 474 Pa. 615, 379 A.2d 535 (1977); *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974). However, even when there has been a long separation occa-

sioned by parental neglect or incapacity, termination of parental rights will not be ordered if there is a reasonable possibility that the causes and conditions which have led to the separation can be remedied and the family restored. *Jones Appeal*, 449 Pa. 543, 297 A.2d 117 (1972), demonstrates our deference to this requirement. There, although the mother was an accomplice to sexual abuse of her daughter, we refused to terminate her parental rights because the evidence did not establish that the causes or conditions leading to the abuse could not be remedied. Id. 449 Pa. at 548, 297 A.2d at 120.

The language of section 311(2) does not admit of an interpretation permitting termination of parental rights based upon personal preferences or speculative concepts of proper child rearing. The needs of the child unmet by the parent must be "essential" and "necessary" to his "physical or mental well-being." In addition, the evidence must establish that the causes and conditions of the deprivation "cannot or will not be remedied."

We conclude that the demanding standards of section 311(2), together with the Legislature's and this Court's strong policy of restraint from interfering with the family, sufficiently protect against the arbitrary and discriminatory application of section 311(2).

■ Similarly, even assuming that decisions affecting private family concerns implicate first amendment values, see *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965), we must reject appellants' argument that the language of section 311(2) may have a "chilling" effect on protected parental conduct. The decisions of this Court interpreting section 311(2) protect parental conduct which does not deprive the child of its essential needs. See *In re Geiger*, supra. However, parental misconduct which deprives the child of essential needs is not protected by the Constitution. Mr. Chief Justice Burger, writing for the Court, stated in *Wisconsin v. Yoder*: "To be sure, the power of the parent even when linked to a free exercise claim, may be subject to limitation . . . if it

appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." 406 U.S. 205, 233–34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). Section 311(2) and our decisions are sufficiently clear to avoid any significant possibility a parent would be inhibited from engaging in protected conduct not constituting deprivation of essential needs of the child.

B. Section 311(2) does not violate substantive due process rights because a state may constitutionally intervene to terminate parental rights when a natural parent's continued incapacity causes the child to be without essential parental care.

 Appellants argue that the application of section 311(2) to terminate their respective parental rights, in the absence of a showing of "high and substantial misconduct" and that their children, while in their custody, had ever suffered substantial physical or mental harm, violates their constitutionally protected interest in mutual association with their children. We do not agree.

 There is no doubt that the Constitution protects the family against certain intrusions by the state. *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), generally considered the seminal case recognizing constitutional protection of family concerns, invalidated a statute which prohibited teaching young children any language other than English because the statute unreasonably infringed upon the liberty interest, protected by the fourteenth amendment, of parents, teachers, and children. Noting that the contours of the liberty interest guaranteed by the fourteenth amendment had never been exactly defined, the Court stated: "Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to . . . marry, establish a home, and bring up children . . .." Id. at 399, 43 S.Ct. at 626. Accord, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (striking down a statute requiring that all children attend public schools). In *Prince v. Massachusetts*,

321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Court recognized that:

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. [citing *Pierce*] And it is in recognition of this that these decisions [*Pierce* and *Meyer*] have respected the private realm of family life which the state cannot enter."

Id. at 166, 64 S.Ct. at 442.

 The continued vitality of the principle that there is a "private realm of family life which the state cannot enter" cannot be questioned. Just last term the United States Supreme Court stated that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1936, 52 L.Ed.2d 531 (1977) (plurality opinion). See also *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 829, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *Wisconsin v. Yoder*, 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968).

 In related cases, the United States Supreme Court has recognized that the Constitution affords protection to "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). See also *Carey v. Population Services International*, 431 U.S. 678, 684, 97 S.Ct. 2010, 2016,

52 L.Ed.2d 675 (1977) (plurality opinion); *Whalen v. Roe,* 429 U.S. 589, 598, 97 S.Ct. 869, 876 (1977); *Griswold v. Connecticut,* supra at 485, 85 S.Ct. at 1682. Personal decisions relating to child rearing are within this zone and protected from unwarranted interference by the state. *Carey v. Population Services International,* supra, 431 U.S. at 684, 97 S.Ct. at 2016 (plurality opinion), citing *Pierce* and *Meyer.*

 These cases do not, however, support the proposition that the state can never interfere in the parent-child relationship. Indeed, in *Stanley v. Illinois,* supra, the United States Supreme Court recognized that the state had not only a right, but a duty to protect minor children. 405 U.S. at 649, 92 S.Ct. at 1212. See also *Prince v. Massachusetts,* supra (upholding anti-child labor statute against challenge that it unreasonably infringed upon parent's and child's free exercise of religion and parent's right to educate child in her beliefs). Constitutional restraint on state interference in family matters does not compel the courts to protect parental rights at the expense of ignoring the rights and needs of children. In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the United States Supreme Court rejected the argument that the state's interest in protecting parental authority justified giving parents a veto power over a minor's decision to have an abortion "where the minor and the nonconsenting parent are so fundamentally in conflict and the very existence of the pregnancy has already fractured the family structure." Id. at 75, 96 S.Ct. at 2844. See also *Wisconsin v. Yoder,* 406 U.S. at 241–49, 92 S.Ct. at 1546–50 (concurring and dissenting opinion of Douglas, J.); *In re Roger S.,* 19 Cal.3d 921, 141 Cal.Rptr. 298, 569 P.2d 1286 (1977) (unconstitutional to permit parent of fourteen year old child to commit the child to a mental institution over the child's objection). In determining whether parental rights should be terminated, the court must recognize the essential needs of the child as well as the rights of the parent.

 The source of the state's authority to intervene in family matters to protect minor children has been said to

be the doctrine of parens patriae, the concept that the sovereign is the father of his country. See, e. g., *Adoption of R.I.*, 468 Pa. at 294, 361 A.2d at 297. Although the doctrine of parens patriae has been subject to critical comment in recent years,[7] there is general agreement that the state has the right and the duty to act to protect its weaker members, such as infants, who are unable to protect themselves,[8] and to compel parents and children alike to act in ways beneficial to society.[9] See Kleinfeld, The Balance of Power Among Infants, Their Parents and the State, 4 Fam. L.Q. 320 (1970), 4 Fam.L.Q. 410 (1970), 5 Fam.L.Q. 64 (1971). The state's responsibility to protect its weaker members authorizes interference with parental autonomy and decisionmaking in appropriate circumstances. The moral and practical importance of this authority was set forth by Chief Justice Maxey in *Commonwealth ex rel. Children's Aid Society v. Gard*:

> "Societies which like the relator are entrusted by the sovereign with power over the lives of infants should ever bear in mind that consideration for the sensibilities of children and solicitude for their well-being is the hallmark of an humane individual and of a civilized state."

362 Pa. 85, 99, 66 A.2d 300, 307 (1949).

Parental rights must be accorded significant protection. *Meyer v. Nebraska*, supra; *Pierce v. Society of Sisters*, supra; *Prince v. Massachusetts*, supra; and *Wiscon-*

---

7. The criticism has generally centered on its invocation to deny due process to infants. See, e. g., *In re Gault*, 387 U.S. 1, 16, 87 S.Ct. 1428, 1437–38, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials of dubious relevance.").

8. E. g., *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (anti-child labor legislation); *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (variable obscenity standard to protect children).

9. E. g., requiring children to attend some school, at least to a certain age. *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972).

*sin v. Yoder,* supra. The state may, however, constitutionally require the rights of parents to yield to the child's essential health and safety needs. See *Wisconsin v. Yoder,* supra; accord, *In the Matter of Petition for Adoption of J.S.R.,* 374 A.2d 860 (D.C.1977) ("[T]he right of a parent to raise one's child is an essential, but not absolute, one, which can be terminated . . . ..").[10] When, as here, a parent is incapable of meeting the child's essential needs, see section II, infra, the state may constitutionally intervene to protect the "physical or mental well-being" of the child. In these circumstances, the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail. This legislative determination must be accorded great deference for "when an issue involves policy choices as sensitive as those implicated by [the involuntary termination of parental rights], the appropriate forum for their resolution in a democracy is the legislature." *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 2385–86, 53 L.Ed.2d 484 (1977). As Mr. Justice Holmes stated in *Missouri, Kansas and Texas Railway Company v. May,* 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904): "[L]egislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

Therefore, appellants' assertion that "high and substantial misconduct" on the part of the parent must be shown before parental rights may be constitutionally terminated cannot be accepted. Their contention ignores the state's constitutional interest in the welfare of the child.[11]

**10.** The District of Columbia Court of Appeals there upheld the involuntary termination of parental rights, finding that 1) the "best interest of the child" standard for involuntary termination is not unconstitutionally vague or violative of due process and 2) a finding of parental unfitness is unnecessary to a determination that the child's interests will be served by termination of parental rights. Accord, *In re Petition of New England Home for Little Wanderers,* 328 N.E.2d 854 (Mass.1975).

**11.** Appellants also argue that the language of section 311(2) requires a showing of a "high and substantial degree of misconduct." This

## II. THE DECREES OF THE ORPHANS' COURT DIVISION TERMINATING THE PARENTAL RIGHTS OF APPELLANTS ARE SUPPORTED BY COMPETENT EVIDENCE.

### A. Scope of Review

Having determined that section 311(2) of the 1970 Adoption Act is constitutional, it remains to be determined whether the orphans' court properly applied the section to the facts of the instant cases. Our scope of review is limited to determining whether the orphans' court's terminations of appellants' parental rights are supported by competent evidence. E. g., *In re: Involuntary Termination of Parental Rights of S.C.B. and K.T.*, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977); *Adoption of M.T.T.*, 467 Pa. 88, 354 A.2d 564 (1976); *Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975) (plurality opinion); *Sheaffer Appeal*, 452 Pa. 165, 305 A.2d 36 (1973). Findings of the orphans' court supported by evidence of record are entitled to the same weight given a jury verdict and must be sustained unless the court abused its discretion or committed an error of law. E. g., *Garges Estate*, 474 Pa. 237, 378 A.2d 307 (1977); *In re Wertman Estate*, 462 Pa. 195, 340 A.2d 429 (1975); *Button Estate*, 459 Pa. 234, 328 A.2d 480 (1974); *Cohen Will*, 445 Pa. 549, 284 A.2d 754 (1971); *Holtz Will*, 422 Pa. 540, 222 A.2d 885 (1966); *Hunter Will*, 416 Pa. 127, 205 A.2d 97 (1964).[12]

contention was expressly rejected in *In Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976). See part II, infra.

12. In determining whether the findings of the orphans' court are supported by competent evidence, we must take as true all the evidence supporting the findings and all reasonable inferences therefrom. See *Kay v. Kay*, 460 Pa. 680, 334 A.2d 585 (1975). Mr. Justice Nix, in his dissenting opinion, departs from this standard by drawing his own inferences contrary to the findings of the orphans' court. An appellate court is not free to draw inferences contrary to the findings of the orphans' court supported by competent evidence.

B. The orphans' court division's determination that appellant Marjorie L.'s continued incapacity to care for her children, combined with her separation from her children since 1971, had caused her three sons to be without "essential parental care," and that this incapacity could not be remedied by appellant, is supported by competent evidence [Appeal at No. 46].

The three children involved in this appeal are Frank, age 13, William, age 11, and Mark, age 7. Pursuant to a voluntary placement agreement, all have been in the custody of Children's Services since June 8, 1971, when they were, respectively, ages 7, 5, and 1. Appellant has never married and none of the fathers of the three children has opposed termination of his parental rights.[13] Appellant has two other children. Carol, the oldest, age 17, has lived with appellant's parents for many years and there are no plans for her to return to her mother. Appellant's youngest child, Tracie, age 6, lives with appellant.

Appellant was pregnant with Tracie at the time she placed her three sons with Children's Services. Children's Services had become involved with appellant and her children because of the severely substandard condition of the home which, according to appellant's caseworker, was unfit for habitation by children.[14] After Tracie's birth Children's Services helped appellant locate an apartment. The apartment appellant selected could accommodate only appellant and Tracie.[15] Frank, William and Mark continued to remain

13. Notice of the termination proceedings was sent to the last known addresses of the fathers of Frank and William. Neither father responded. Notice was sent to a man alleged to be the father of Mark. The man denied by affidavit that he was Mark's father, relinquished any parental rights he might have to Mark, and waived any right to further notice in this or any subsequent proceedings involving Mark.

14. The caseworker testified that the home was roach infested, that appellant had seen a rat near the refrigerator, and that appellant agreed that the housing was unfit for children. Appellant did not contradict this testimony.

15. According to the caseworker, appellant at first could not decide whether to take the apartment, or wait for housing which could

in foster care, and appellant visited them once a month at the Children's Services' office. In November, 1974, while still in the two-person apartment, appellant requested that her three sons be returned. The agency, concluding appellant was unable to provide the children with appropriate care and supervision, declined. Children's Services advised appellant of the availability of legal services and in December, 1975, with the assistance of counsel, appellant petitioned for visitation with the children in her home. The court of common pleas ordered that her visitation be increased to twice a month, and that visitation be at her home.

Shortly after the three boys entered foster care in 1971, nutrition aids began regularly visiting appellant's home to help her maintain her household and raise Tracie.[16] Appellant has continuously relied heavily on these aids for even the more simple tasks of everyday life. The nutrition aid supervisor testified that in the three week period before the hearing appellant had visited her approximately seventeen times for assistance with various minor problems, even though the supervisor's office was some distance from appellant's home. Despite the continuous assistance, however, appellant has made little or no progress in learning how to cope with problems on her own, and the aids must necessarily continue to perform basic tasks for appellant.[17]

accommodate all four children. She finally decided to take the smaller apartment, in which she still resides.

16. According to the nutrition aid supervisor, the program encompasses more than advice on food and diet planning. The aids advise on a variety of matters, including child care, money management, and housekeeping.

17. For example, at one time school authorities would not allow Tracie to go to school because she had lice. The supervising nutrition aid encountered great difficulty explaining to appellant, and having her perform, the necessary procedures to rid Tracie of the lice, which involved shampooing and using a special comb, to get the nits out of Tracie's hair. Appellant seemed unable to understand the necessity of removing the nits. When Tracie still had nits after two weeks, and was upset about missing school, the aid treated Tracie.

Similarly, appellant has made no significant progress in learning how to budget and manage her money. In the past, appellant's heat and electricity were frequently turned off because she neglected to

The record establishes that appellant is minimally capable of caring for her youngest daughter Tracie, even with the extensive assistance she receives from the nutrition aids. The record also establishes, however, that appellant's capabilities are taxed beyond their limits when she attempts to supervise and control her three sons, in addition to Tracie. The caseworkers and aids present during the custodial visits ordered in 1975, which continued regularly up to the time of the hearing in May, 1976, testified that general havoc prevailed during the visits. They described the visits as "free-for-alls" in which appellant chased one child after another attempting to keep them under control. The visits failed to re-establish closer ties between appellant and the boys. Frank and William were observed to "tolerate their mother." Mark, who has been with the same foster family since he was one year old, was unable to relate emotionally to appellant or his brothers and would simply watch television.

All three children testified in chambers and, although they expressed some affection for appellant, agreed that they did not want to live with appellant. Frank, then 13, openly admitted that he refused to obey appellant and that she was incapable of doing anything about it. He believed that appellant would not be able to care for him and his brothers.

pay her bills. On one occasion, appellant came to the nutrition aid supervisor requesting emergency financial assistance because she believed she owed money for rent, gas, water, and lights. When the aid contacted various utilities and appellant's landlord (the housing project director) she learned that, in fact, appellant did not owe money to any of them. Workers at the Salvation Army told the nutrition aid that appellant came to them frequently with similar requests. There was no indication that appellant intended to defraud anyone; rather, she simply was unable to keep track of her income.

The nutrition aids suspected that others often took advantage of appellant's inability to manage her money. On several occasions appellant told the nutrition aids of giving money to people for such things as toys, which were never delivered. Appellant's sole income is a monthly Supplemental Security Income (SSI) allowance. One nutrition aid observed on three different occasions that a creditor came to appellant's house on the day her check arrived and appellant turned over her check to him. He took the checks, cashed them, and, after deducting money allegedly due, returned what was left.

In January, 1976, appellant, at the request of Children's Services, agreed to be interviewed and tested by a psychologist. The psychologist administered a structured interview called the Vinelin Social Maturity Scale and the standardized Slosson Intelligence Test. The first test indicated that appellant's social skills and ability to function independently were at about the twelve year old level. The intelligence test, which measures numerical and verbal reasoning skills, indicated that appellant had an IQ of 43 and a mental age of six years, ten months.[18] Although appellant testified at the hearing that she had completed the seventh grade in school, she told the psychologist that she did not know how to read. The psychologist testified that appellant had limited communication skills and showed considerable difficulty in comprehending simple ideas concerning housework, cooking, and child care. In her psychological evaluation, the psychologist concluded that appellant lacked the social maturity and intellectual capability to cope with the continuing responsibilities of raising children.[19]

The orphans' court terminated appellant's parental rights to her three sons pursuant to section 311(2) of the Adoption

18. Appellant began failing test items at the five year level and low six year level. She passed a few items at the seven and eight year level, but did not pass any of the test items at the nine year level and above.

 In 1963, when hospitalized after suffering from apparent hallucinations, appellant was administered the Weschler Adult Intelligence Test, which rated her IQ at 57. The psychologist testified that both scores placed appellant in the range of the educable or trainable mentally retarded.

19. Although the psychologist did not testify directly concerning appellant's mental health, there is evidence suggesting that appellant suffers from some mental instability. In 1963 appellant was hospitalized for a month after suffering from the delusion that she was pregnant and about to deliver. The supervising nutrition aid testified that appellant once asked her to locate a certain boyfriend of appellant's. Upon investigation, the aid discovered that the boyfriend did not exist. Another aid testified to a story appellant had told her, which appellant repeated under examination by Children's Services' counsel at the hearing, of having seen her mother kill her father when appellant was a young girl, after which her mother buried him in the family's back yard. The circumstances surrounding appellant's relation of this story rendered it incredible.

Act. As this Court observed in *In re Geiger,* 459 Pa. 636, 639, 331 A.2d 172, 174 (1975), this section requires that three facts be shown before parental rights may be terminated: (1) repeated and continued incapacity, abuse, neglect, or refusal; (2) such incapacity, abuse, neglect, or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied. A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The Legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties. The orphans' court properly adhered to this statutory determination and concluded that the elements of the statute—continued incapacity to meet the children's essential needs—had been demonstrated by clear and convincing evidence. The orphans' court stated:

"It is absolutely clear to the court that, by reason of her very limited social and intellectual development combined with her five-year separation from the children, the mother is incapable of providing minimal care, control and supervision for the three children. Her incapacity cannot and will not be remedied."

Having first determined that grounds for termination existed, the orphans' court held that the best interests of Frank, William and Mark dictated that appellant's parental rights be terminated in order that the opportunity might be afforded the three boys to enjoy a stable family relationship through adoption. We find the decree of the orphans' court supported by competent evidence.

Appellant argues that the decree cannot be sustained because there was no compelling evidence that Frank, William, and Mark, while in her care, were ever neglected, abused, or abandoned by appellant or deprived of a basic

health need such as food, medical care, clothing, or shelter. Appellant also asserts that a "high and substantial degree of misconduct" by the parent must be demonstrated before the parent's rights to a child may be terminated. She contends that section 311(2) requires a showing that substantial physical or mental harm resulted from the absence of a basic necessity such as food, clothing, shelter, or medical care, and that such harm occurred while the child was living with its parent. Finally, appellant argues that a child cannot be deprived of "essential parental care, control, or subsistence" while in foster care.

Nothing in the language of the act requires a showing of a "high and substantial degree of misconduct" before parental rights can be terminated.[20] In *Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976), this Court rejected the contention that "willful misconduct" was a necessary predicate to termination of parental rights. Id. 468 Pa. at 297–98 n.10, 361 A.2d at 299 n.10. The notion that a showing of parental misconduct is necessary before parental rights may be terminated rests upon the erroneous assumption that the purpose of section 311(2) is to punish an ineffective or negligent parent. Section 311(2) reflects a deep concern for the essential needs of the child, not a legislative vengeance against parental misconduct. The official comment to the Adoption Act of 1970 states that the provision "centers judicial inquiry upon the welfare of the child rather than the fault of the parent." Joint State Government Commission, Official Comment, Adoption Act (1970). Thus, section 311(2) authorizes termination upon a showing of parental incapacity, when the incapacity "cannot or will not be remedied by the parent" and has "caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being." The Legislature clearly mandated that, in such circumstances, the "physical or mental well-being" of the child must be protected.

**20.** Appellant contends that such an interpretation is constitutionally compelled. This argument was rejected in part I, supra.

██ Neither the language of section 311(2) nor our case law supports appellant's contention that section 311(2) requires a showing that the child suffered substantial physical or mental harm while in the parent's custody, see *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974), or that a child cannot be deprived of "essential parental care, control, or subsistence" while in foster care, see *Adoption of R.I.,* 468 Pa. 287, 361 A.2d 294 (1976). Appellant argues that her narrow construction is necessary to protect the family from unwarranted and potentially harmful intrusions by the state. However, the need to guard against unwarranted state intrusion in family affairs does not require an interpretation of section 311(2) precluding its application in circumstances where, as here, the family has no prospect of being reunited and the physical and mental needs of the three children, who have already been out of the home since 1971, cannot be met by the parent.

██ It is the policy of this Commonwealth to preserve and protect the family whenever possible. The Juvenile Act like the Adoption Act, concerns state intervention in the parent-child relationship when essential to protect the welfare of the child.[21] The Juvenile Act provides:

"This Act shall be interpreted and construed as to effectuate the following purposes:

(1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this act.

. . . . .

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interest of public safety."

21. To the extent that both acts relate to state intervention in the parent-child relationship, the Juvenile Act and the Adoption Act may be considered in pari materia. 1 Pa. C.S.A. § 1932 (Supp.1977). See *Adoption of R.I.,* 468 Pa. 287, 295 n.9, 361 A.2d 294, 298 n.9 (1976).

Act of December 6, 1972, P.L. 1464, § 1(b)(1), (3), 11 P.S. § 50–101(b)(1), (3) (Supp.1977). Thus, our courts have held that, under the Juvenile Act, the state may act to remove a child from its home only upon a showing of "clear necessity." *Adoption of R.I.,* 468 Pa. at 294, 361 A.2d at 297 (dictum); *Interest of Larue,* 244 Pa.Super. 218, 225, 366 A.2d 1271, 1275 (1976); *Stapleton v. Dauphin County Child Care Services,* 228 Pa.Super. 371, 391, 324 A.2d 562, 572 (1974); *Rinker Appeal,* 180 Pa.Super. 143, 117 A.2d 780 (1955).

█ This policy of restraint, however, is not intended solely to protect the rights of parents. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. Goldstein, Freud & Solnit, Beyond the Best Interests of the Child 20, 31–34 (1973), cited in Wald, "Search for Realistic Standards," supra at 994. Thus the policy of restraint is incorporated in the demanding standards of our removal and termination statutes to protect the family from harmful and unwarranted state intrusion.

The "continuity of relationships" consideration, however, is equally applicable where, as here, the child has lived with one foster family for a considerable period of time. Removal of the children from their foster homes, or inflicting upon them the fear that they might be removed at any time, could create psychological and emotional distress similar to that caused by their removal from their natural parent. See *Adoption of R.I.,* supra, 468 Pa. at 299 n.13, 361 A.2d at 300 n.13; *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 97, 66 A.2d 300, 306 (1949); Foster, Adoption and Child Custody: Best Interests of the Child?, 22 Buff.L.Rev. 1, 11–14 n.8 (1972). The language of section 311(2) should not, therefore, be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect, where, as here, disruption of the family has already occurred and there is no reasonable prospect for reuniting it without serious emotional harm to the child. In such circumstances, the issue is not whether the state should

intrude to disrupt an on-going family relationship, but whether the state should seek to preserve in law a relationship which no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions.

 Appellant's contention that a child can never be without essential parental care while in a foster home is neither factually correct nor required by the law.[22] Appel-

22. Our courts have long recognized that a biological parent's claim to a child can be weakened by long separation causing the parent's relationship with the child to dwindle, while the child develops other, more stable ties. In *Commonwealth ex rel. Children's Aid Society v. Gard,* Chief Justice Maxey, writing for the Court, observed that a child will become strongly attached to those

> "who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection [may] have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury. . . . Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process. In passing on the contested custody of children no judge can do justice without considering the human aspect of this problem."

362 Pa. 85, 97–98, 66 A.2d 300, 306 (1949). See *Davies Adoption Case,* 353 Pa. 579, 588, 46 A.2d 252, 257 (1946); *Stapleton v. Dauphin County Child Care Services,* 228 Pa.Super. 371, 324 A.2d 562 (1974).

In *Smith Adoption Case,* this Court recognized that parental rights may be terminated if a parent does not affirmatively act to meet the child's essential needs but rather allows others to meet those needs. We there stated:

> "Parental rights may not be preserved by complete indifference to the daily needs of a child or by merely waiting for some more suitable financial circumstances or convenient time for the performance of parental duties and responsibilities (while others adequately provide the child with her immediate and continuing physical and emotional needs). The parental obligation is a positive duty and requires affirmative performance which may not be delayed beyond the statutory period by the parent if the parental right is not to be forfeited."

412 Pa. 501, 506, 194 A.2d 919, 922 (1963).

Although *Gard* and *Stapleton* involved custody disputes, and *Davies* and *Smith* involved abandonment, the principle that a parent's claim to his child is weakened by long separation and development by the child of other, closer, attachments applies equally to a proceeding under section 311(2) which, "is intended to center judicial inquiry upon the welfare of the child, rather than the fault of the

lant's interpretation of section 311(2) would, contrary to the legislative mandate, protect the rights of a parent long separated from her child at the expense of the essential physical and mental needs of the child. To the contrary, when continued incapacity prevents a parent from caring for the child and, as a result, the parent-child relationship is substantially "weakened by long separation" and cannot be re-established, parental rights may be terminated so that the child may have an opportunity to escape the limbo of foster or institutional care and establish a new parent-child relationship through adoption.

Here, appellant's three sons have been in foster care since 1971. Perhaps in recognition of her own inability to care for them, appellant made no effort to secure the return of her three sons for more than three years.[23] Despite her regular visits, appellant's relationship with her sons, especially the youngest, has greatly deteriorated. All three regard their foster parents with affection [24] and have no desire to return to appellant's custody. In determining whether appellant's continued incapacity had caused them to be "without essential parental care, control, or subsistence necessary for

parent." Joint State Government Commission, Official Comment, Adoption Act (1970).

23. The orphans' court found as a fact that the "mother began to request the return of the children in November of 1974."

Appellant's caseworker testified that appellant made no request for the return of her sons before November, 1974. Appellant testified that she had "asked to have them all back, but just like I say, the caseworker just gives you the run around, and I went to Legal Aid Society, went in the middle part of January." She did not indicate when she first requested their return before going to legal aid in January, 1975.

24. The foster parents of Mark, who has been with the same foster family since 1971 when he was one year old, and the foster parents of William, who was five years old at the time of placement in 1971, have told Children's Services they are interested in adopting the boys. Frank referred to his foster mother as "mom" and expressed his clear preference to remain with his foster parents.

Appellant's own testimony indicated attenuation of the relationship between herself and her sons. Appellant demonstrated little knowledge of the habits and interests of her sons, other than that they liked to watch TV and play baseball. She was unaware of what grade in school any of the boys was in, or how they were doing in school.

[their] physical or mental well-being," the orphans' court properly considered the fact that appellant's inability to care for the three boys since 1971 effectively precluded the possibility that the family would ever be reunited.[25] The orphans' court concluded that "the mother will never be capable, in our judgment, of resuming custody. The choice is between the limbo of continuing fosterhood and the potentiality of a normal parent-child relationship."

The orphans' court's determination that appellant's continued inability [26] to care for her three sons, combined

**25.** This conclusion is consistent with our decisions in *Adoption of R.I.,* 468 Pa. 287, 361 A.2d 294 (1976) and *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975). In *Adoption of R.I.,* we rejected the requirement of a showing of "willful misconduct" because it "would deny R.I. the benefits of a family through adoption and continue the long period of temporary care to protect a possible reunion which has been shown will not occur." 468 Pa. at 298 n.11, 361 A.2d at 299 n.11. Although in holding that R.I. had been deprived of essential parental care we relied on evidence of physical deprivation leading up to her removal from the home, nothing in our opinion indicates that her long stay in foster care was irrelevant to this question, and we clearly relied upon the long stay in foster care in determining that the neglect or incapacity of her natural mother was irremediable.

In *Geiger,* we reversed an order terminating a mother's parental rights. The termination was based on opinion evidence that the house was " 'submarginal' " and " 'was setting a cultural standard for these children which *would be a deprivation in the future.*' " 459 Pa. at 640, 331 A.2d at 174 (emphasis in original). There, the child welfare agency had removed the children from the home on this basis and sought termination of the rights of both parents. The propriety of the removal was not before us. However, unlike here, there was no allegation that the children had spent any substantial time out of the home or that, with agency assistance, the family could not be reunited.

Appellant's assertion that, before her rights can be terminated pursuant to section 311(2), it must be shown that her children suffered some substantial harm such as deprivation of food, clothing, or shelter while in parental custody, is contradicted by *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974). Like appellant, the mother in *Diane B.* voluntarily placed her child in the custody of the children's agency. Nonetheless, this Court held that the mother's subsequent conduct in failing to support her child or maintain a close relationship with the child caused the child to be "without essential parental care" and justified termination of the mother's rights under section 311(2).

**26.** In reviewing whether the evidence supports the orphans' court's decree, we have placed only limited reliance on appellant's IQ score.

with her separation from her children since 1971, had caused her three sons to be without "essential parental care, control or subsistence necessary for [their] physical or mental well-being," and that this incapacity could not or would not be remedied by appellant is supported by competent evidence. See *Appeal of Diane B.,* 456 Pa. 429, 321 A.2d 618 (1974).

C. The orphans' court division's determination that appellant Gladys B.'s "repeated and continued incapacity" to maintain a safe and sanitary home had caused her daughter Judith to be without "essential parental care, control or subsistence" and that such incapacity would not or could not be remedied is supported by competent evidence [Appeal at No. 113].

Judith Denise B., age 11, is appellant Gladys B.'s youngest child. Judith's father left the home many years ago and his whereabouts are unknown. Judith has been in foster care since November, 1974, pursuant to an order granting custody of Judith to appellee, Lycoming County Children's Services [Children's Services].[27]

In 1974, four of appellant's six minor children resided with her—Dorothy, then age 17, Boyd, then age 15, David, then age 12, and Judith, then age 9. An older daughter, Joan,

Experts generally agree that socially and culturally disadvantaged people tend to score lower on standardized intelligence tests, which suggests that cultural bias may affect the result. See Galliher, Termination of the Parent-Child Relationship: Should Parental I.Q. be an Important Factor?, Law and the Social Order 855, 865–66 (1973). Moreover, "No Study has ever documented the premise that unintelligent parents are unable to give love and affection." Id. at 871. Consequently, we consider appellant's test score only as a factor among many relevant to her incapacity to meet the essential needs of her children.

27. The juvenile proceedings were not incorporated in the record, but the record does indicate that custody was taken from appellant because previous court-ordered efforts by Children's Services to help improve the physical conditions in the home had been unsuccessful and because Judith participated with her older brothers in the commission of a juvenile offense.

and her two children also resided with appellant.[28] Appellant was well known to public health officials and Children's Services as a result of frequent complaints received over the years concerning extremely unsanitary conditions in the different homes in which the family had lived. Children's Services had worked with the family since 1966. The caseworker involved from August 1971 until August 1975 testified that, without exception, when she visited appellant's home the floor was strewn with raw garbage on which one could not avoid stepping. She observed dogs running free throughout the house, eating off dirty diapers, and occasionally stealing food from the plates of the younger children.

A Williamsport Public Health Officer testified to responding regularly over a ten year period to complaints filed by neighbors while appellant lived at seven different addresses. Typically, the complaints related to insect and rodent infestation and accumulations of garbage. Invariably, he found the houses grossly unsanitary, with garbage scattered both inside and about the home. Dirty clothes and particles of food were all over the floors; during the summers, he observed maggots in the food. Appellant's refrigerator was always filthy and usually contained moldy food. Roach infestation was the norm, and in appellant's last two residences, including the residence she occupied with the children in 1974, roaches were even inside the refrigerator. About the time Judith was placed in foster care, appellant was evicted from her residence in the housing project. The public health officer testified that the whole row of houses adjoining appellant's residence had to be fumigated, which took about four months. He testified that most of the twenty-five to thirty times he visited appellant's residences they were so unsanitary as to be unfit for human habitation.

A school counselor, associated with appellant's family over an eight year period, corroborated the testimony concerning the condition of the homes. In the course of her work she visited appellant at three different residences. At each

28. Appellant has one other older daughter, Shirley, who apparently lived elsewhere at that time.

residence raw garbage and food was scattered on the floor and the odor of animal feces permeated the air. The counselor met appellant while working with Judith's brother David, who was a truancy problem. Children at school teased David because of his filthy clothes and lack of personal hygiene. The counselor testified that appellant listened to her recommendations, but did nothing to correct the problems.

In February, 1974, a juvenile probation officer visited the home. It was extremely squalid. The windows were out, a condition the public health officer testified was common at appellant's residences. Room temperature was below freezing and there was no heat. The probation officer could not recall if he had seen Judith, but the children he observed were inadequately clothed, including an infant wearing only a diaper. In an apparent effort to heat the house, the gas burners on the stove were turned on at full capacity. Nearby, dirty laundry was stacked up, creating an alarming fire hazard.

These conditions, as well as complaints from neighbors concerning a lack of supervision over the children, led Children's Services to seek custody of Judith in the Spring of 1974. Rather than remove Judith at that time, the court ordered Children's Services to visit the home regularly and assist appellant in improving conditions.

In March, 1974, Judith's sister Dorothy, then 17, was involved in a burglary. The juvenile court removed Dorothy from the home and placed her in foster care where she remained until she was 19. She is now enrolled in college and living outside the home. Judith's brother Boyd, then 15, was also involved in juvenile offenses. In 1973, he was before the juvenile court twice, once for burglary and larceny, and a second time for burglary. In October of 1974, he was again before the juvenile court for bicycle thefts, in which he had enlisted the aid of his 13 year old brother David and Judith, then 9 years old. Boyd was removed from the home and placed in a juvenile institution where, according to the testimony, he had an excellent record and

improved educationally and socially. He returned to the home in November, 1975, but less than three months later, he was again removed after yet another theft offense. He was placed in a residential work experience program where, once again, he had an excellent record and seemed to mature considerably. He completed the program, returning home in August, 1976. His caseworker testified that, at age 17, he appeared sufficiently mature to get by on his own.

David and Judith were also removed from the home following the theft offense. After completing a youth development program, David was placed in a foster home and is now in a private group home. There are no plans for his return to appellant's custody.

Appellant's caseworker testified that, rather than improving, appellant's home deteriorated from Spring, 1974, when Children's Services first petitioned for Judith's custody, until October, 1974, when Judith was removed. Moreover, Judith's involvement in the bicycle thefts and her increasing truancy indicated that serious behavioral problems were developing. Since placed in the custody of Children's Services, she has been in a stable foster home and appears well adjusted. Children's Services considers her prospects for adoption excellent.

After appellant's minor children had been removed from the home in 1974, Children's Services attempted to develop a plan with appellant which would allow Judith to return. The plan involving working with nutrition aids to improve her housekeeping and food preparation skills, seeking counseling, and allowing caseworkers to monitor conditions in the home. There was testimony that aids and caseworkers visited the home on a few occasions when conditions seemed to have improved and the home appeared reasonably sanitary. However, opportunities for observation of conditions in the home were limited because appellant was often not at home, or did not answer the door, when the nutrition aid arrived for scheduled visits, or a caseworker came to the house. Sometimes appellant or her daughter Joan refused

to allow the caseworker inside and spoke to her at the door or through a window.

That unsanitary conditions persisted in the home was again revealed in February, 1976. David had run away from his foster home and juvenile probation caseworkers came to appellant's home where David was hiding. The conditions were so deplorable that the juvenile officers requested Children's Services to make an immediate visit. Although all of appellant's minor children were then living elsewhere, the agency was concerned about the infant children of Joan, appellant's daughter. Garbage and food were strewn on the floors throughout the house, including the upstairs. Dirty diapers were found on the floors, along with feces from several dogs and cats, causing a foul odor to permeate the house. Photographs confirm the testimony describing these grossly unsanitary conditions.

Children's Services petitioned for custody of Joan's children. The agency reached an agreement with Joan whereby she obtained and is maintaining a separate residence with her children.

Appellant's willingness to cooperate with Children's Services in improving the conditions of her different residences and supervising her children has varied over the years. At times, she has listened to the suggestions of caseworkers and expressed her intention to improve her housekeeping and child care skills. Similarly, the public health officer and the school counselor who worked with David testified that appellant would hear them out and promise to follow their suggestions. Invariably, however, appellant made no effort to alleviate the offensive conditions. At other times, appellant expressed hostility towards the agency and the caseworkers for interfering in her life. Nutrition aides discontinued their visits in late 1975 because appellant was never home at the agreed times.

Appellant, who completed only two years of schooling and is illiterate, has shown over the years almost no comprehension of even rudimentary standards necessary to maintain minimal living conditions and to supervise her children.

Repeatedly, she expressed a complete inability to control the children, whom she blamed for the unsanitary conditions. For example, when advised by different caseworkers that the animals running loose throughout the house had to be controlled, she answered that she could do nothing about them because they were the children's pets.

The orphans' court concluded that, although appellant appeared to love Judith, the evidence clearly established appellant's "continued and repeated incapacity" which had caused Judith to be without "essential parental care, control or subsistence necessary for her physical and mental well-being." The court found that this incapacity, which it attributed primarily to appellant's lack of emotional control and self-discipline, was irremediable. Having determined that grounds existed justifying termination of appellant's parental rights under section 311(2) of the Adoption Act, the court concluded that Judith's best interests would be served by terminating appellant's parental rights so that Judith might be adopted into a responsible family, able to meet her essential needs.[29] The decree of the orphans' court is supported by adequate and competent evidence.

As in the appeal of Marjorie L., appellant Gladys B. argues that the decree cannot be sustained because there was no compelling evidence of a "high and substantial degree of misconduct" by appellant or that Judith, while in appellant's custody, ever suffered serious harm from lack of food, clothing or shelter. We rejected the former argument in Part II B of this opinion, insofar as it relates to the requirements of the Adoption Act. Although Judith never suffered serious harm while in appellant's custody, the record fully supports the orphans' court's finding that the conditions in appellant's homes while Judith was in her

29. Appellant has not argued that, even if grounds justifying termination under section 311(2) have been shown, it would be in Judith's best interests to deny the petition. We note only that the orphans' court considered this possibility and concluded that, particularly in light of the progress which had been made by Dorothy and Boyd outside the home, Judith's best interests would be served by adoption.

custody constituted a serious threat to Judith's health and safety. We cannot agree with appellant that where, as here, a serious threat to health and safety has been shown, the court cannot terminate parental rights until serious harm actually occurs. It would indeed be an insensitive requirement that actual harm must first come to the child before the Commonwealth's interest in the child's health and welfare could be invoked.

Appellant's reliance upon *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975), in which this Court reversed a decree terminating parental rights under section 311(2), is misplaced. *Geiger* does not support appellant's contention that substantial physical harm to the child must first be shown before parental rights may be terminated. In *Geiger,* the orphans' court relied upon evidence that the home condition was "submarginal" and would cause a "cultural deprivation," in the future, to support termination of the parent's rights. Here, unlike in *Geiger,* the orphans' court's decree was based upon substantial evidence establishing that the conditions in appellant's different homes presented a serious health and safety hazard, and not merely a "cultural deprivation."

In addition to the threat to Judith's health presented by appellant's inability to maintain a safe and sanitary home, the record supports the orphans' court's conclusion that appellant is incapable of supervising Judith. Appellant admitted she was unable to control her children when they were at home and, before Judith was taken from appellant's custody, Judith appeared to be entering the same pattern of delinquency exhibited by her older brothers and sister.[30]

**30.** We do not imply that evidence of delinquent behavior, standing alone, justifies an inference of parental incapacity to provide proper care, control and supervision of the child, for the causes of juvenile crime are too myriad, complex, and imperfectly understood. See generally, M. Wolfgang and L. Radzinowicz, Crime and Justice (1971). Here, however, appellant's own testimony indicated that appellant was unable to control the children and, at least with regard to Judith, Boyd, and Dorothy, their antisocial behavior ceased whenever they were outside appellant's home and in the custody of others.

Judith has been in foster care since 1974. Appellant's incapacity to maintain a minimally adequate home or to supervise her children, which has already led to the disruption of the family for many years, has not been remedied despite ten years of assistance from caseworkers, nutrition aides, public health officials, and school counselors. The orphans' court properly concluded that appellant's incapacity would not or could not be remedied.

## III. SUMMARY

We hold that section 311(2) is not unconstitutionally vague in light of its demanding standards and the strong policy of restraint from interfering in the family developed in our case law. We also hold that, on the facts of these cases, the application of section 311(2) to terminate appellants' parental rights is constitutionally permissible. Finally, we hold that there is competent evidence in each appeal supporting the orphans' court's decrees terminating appellants' parental rights pursuant to section 311(2) of the Adoption Act.

Decree in Appeal No. 46 terminating the parental rights of Marjorie L. is affirmed. Each party to pay own costs.

Decree in Appeal No. 113 terminating the parental rights of Gladys B. is affirmed. Each party to pay own costs.

NIX, J., filed a concurring and dissenting opinion.

MANDERINO, J., filed a dissenting opinion.

NIX, Justice, concurring and dissenting.

I dissent as to the termination of parental rights of appellant Marjorie L., not only because the facts of this appeal, as accepted by the majority, clearly do not warrant termination of parental rights due to incapacity under section 311(2), but also because the majority's expansive interpretation of this section creates serious constitutional problems.

Appellant, Marjorie L., is the natural mother of three boys, Frank, William and Mark. It is with respect to these three sons that the Lycoming County Children's Services

Agency (Children's Services) sought involuntary termination of appellant's parental rights. Appellant, who currently resides with her six-year-old daughter, Tracie, in a public housing project, subsists on a Supplemental Social Security Income Allowance, public assistance grants, and food stamps. Psychological testing indicated that appellant is mentally retarded but educable and trainable.[1]

The record shows that in June of 1971, due to the unhealthy condition of her dwelling at that time, her advanced stage of pregnancy and her difficulty in finding day care assistance for her sons,[2] appellant voluntarily placed her sons in custody of Children's Services, with every expectation that she would regain custody of her sons as soon as her situation improved. The sons have lived in foster homes since June of 1971. Children's Services set up a visitation

[1]. The majority's suggestion that appellant suffers from some mental instability is without support in the record. There was no finding by the lower court that appellant was mentally unstable, and the delusion of pregnancy suffered by appellant nearly 15 years ago, and referred to by the majority, could hardly constitute substantial evidence of a present instability. *See Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (1975). In straining to find support for the theory that appellant "suffered from some mental instability", the majority takes facially neutral evidence and wrenches factual inferences that are unwarranted and unfavorable to appellant. In describing appellant's failure to locate a certain boyfriend, the majority states that the boyfriend did not exist. Although these were the words used by appellee's witness to describe the witness' unsuccessful attempt to locate the boyfriend, the context of the comment shows that the witness merely meant that she could not establish the identity of the boyfriend, not that the boyfriend was a figment of appellant's imagination.

The testimony of the county nutrition aide supervisor concerning appellant's account of her father's death, although of highly questionable relevance, was also seized upon by the majority to support its thesis of mental instability. Although appellant later adopted this account and it was not rebutted, the majority transforms this testimony into evidence of appellant's delusions by stating that "the circumstances surrounding appellant's relation of this story rendered it incredible." If such stories were incredible merely because they were bizarre, this Court could quickly dispose of numerous homicide appeals by discharging defendants who committed "incredible" murders.

[2]. At that time her sons ranged in age from one year to seven years. Tracie was born in September, 1971.

schedule, and from June, 1971 until November, 1974, appellant and her sons met on a monthly basis, usually at the Children's Services offices, but occasionally, during summer months, at nearby parks. After seeking legal assistance, appellant, in December, 1975 obtained a court decree increasing the visits to bi-monthly and allowing the visits to take place at appellant's home. Over the years, appellant has never missed any of the visits with her sons, and the record shows that during the home visits, appellant fed, entertained and conversed with her sons. To the extent possible under the circumstances, appellant has maintained continual contact with her sons and has kept abreast of her sons' activities; despite her difficult financial position, appellant has remembered her sons with gifts on special occasions such as Christmas or Easter. Since June of 1971, appellant frequently expressed to Children's Services officials, nutrition aides, and the county nutrition aide supervisor her desire to regain custody of her sons.

Shortly after the birth of her daughter Tracie in September, 1971, in order to provide a better home, appellant moved to the housing project where she now lives. The record shows that appellant is a conscientious mother; she maintains a clean, healthy home and provides adequate care for Tracie. Because of her limitations appellant has frequently enlisted the help of nutrition aides to maintain her household; she has always cooperated with these aides. Notwithstanding appellant's low intelligence, focused upon by the majority, during the proceedings in the lower court, appellant was lucid in her responses to direct examination, cross-examination and questions from the bench. The thirty pages of appellant's transcribed testimony presented the picture of a mother who was knowledgeable in all facets of her daily existence; she knew her sources of income, the nature of her responsibility to her daughter, and she was acutely aware of the serious nature of the termination proceedings. In response to counsel's question as to what effect the loss of her sons would have upon her, appellant said, "I'm going to take it pretty hard." The majority's

characterization of appellant as a deluded retard is grossly inaccurate. Her voluntary decision to seek the aid of a social agency in June of 1971 is but another indication of appellant's ability to appraise the needs of her family, to recognize when they were not being adequately provided for, and to successfully secure effective means to meet the needs of her children.

Section 311(2), upon which the termination of parental rights rests in the instant appeal, provides for such termination on the ground that:

"(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent:" Act of July 24, 1970, P.L. 620, No. 208, art. III, § 311(2), 1 P.S. § 311(2) (Supp.1977–78).

The majority asserts that "the basis for termination is several years of demonstrated parental incapacity, *which does not involve parental misconduct.*" In my judgment this premise ignores the record and introduces an insidious and dangerous philosophy completely at odds with fundamental American values. First, I take issue with the claim that there has been a demonstration of parental incapacity as envisioned in this section. The majority relies upon the fact that Marjorie L.'s limited intelligence handicaps her in the performance of her parental responsibilities. I would not dispute the possibility that a brighter, better trained and more affluent mother might be more proficient in the discharge of parental responsibilities. I do, however, reject the contention that this fact would empower a state to dissolve a maternal relationship and to create an artificial one that the state might deem "more advantageous." *Cf. Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *In re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975). The example provided by the Nazi Germany Youth Camps should

dissuade anyone who might be tempted to opt for such a sterile clinical approach to child rearing. The majority has totally disregarded the wisdom of Judge Woodside in *Rinker Appeal*, 180 Pa.Super. 143, 117 A.2d 780 (1955), wherein he stated:

A child cannot be declared "neglected" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*Id.* 180 Pa.Super. at 148, 117 A.2d at 783.[3]

By its indifference to law and sound judicial caution, the majority has terminated the parental rights of a mother who did all she could with the few natural attributes that God gave to her.

In applying a statute, this Court must construe the words of the statute "according to their common and approved usage." Statutory Construction Act of 1972, Act of December 6, 1972, P.L. 1339, No. 290, § 3, 1 Pa.C.S.A. § 1903(a) (Supp.1977–78). Turning to Webster's Third New International Dictionary, we learn that "incapacity" is the state of being incapable, i. e., lacking capacity, ability or qualification for the purpose or end in view. In the instant case, the majority itself states that appellant is "minimally capable" of caring for a child. In considering a question as momentous as the involuntary termination of parental rights, it is not semantic quibbling to point out that a parent who is

**3.** Judge Woodside's *caveat* in *Rinker Appeal*, 180 Pa.Super. 143, 117 A.2d 780 (1955) arose in the context of an appeal from an award of custody. His warning should be accorded even greater weight in cases such as the instant one involving the irreversible termination of parental rights based upon an alleged parental incapacity.

minimally capable of caring for a child cannot also be, in fact and in logic, legally unqualified as a parent.

Section 311(2) requires not only a finding of incapacity but also a showing that the incapacity resulted in an absence of parental care and control. Here the record indisputably reflects that Marjorie L. recognized her limitations and sought assistance from those public agencies available to her. Her continuing interest, love and affection for these children has never been questioned. At every opportunity she maintained communication to assure that their relationship would be sustained. If appellant were fortunate enough to have been financially able to solicit this assistance from private sources, the question of termination of her parental rights would never have arisen.[4] It cannot be said that the mother's infirmities resulted in the children's deprivation of parental care, control or subsistence. Her only "sin" was to seek assistance from a public agency in providing these needs. Thus, in essence, the majority holds that where an indigent parent seeks the support of a public agency to assure assistance in obtaining adequate care for the child, the parent does so upon pain of being found to have been incapable of performing the duties of parenthood and subject to the termination of parental rights.

There is also no basis for finding that "the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent." 1 P.S. § 311(2) (Supp.1977–78). In the instant appeal, the cause of appellant's supposed incapacity is her lack of intellectual talent or ability. How-

---

**4.** Financially secure parents suffering from the same mental or intellectual deficiencies as appellant Marjorie L. conceivably could hire nurses or seek the services of a private agency to aid in their childrearing. Thus, wealthy parents of families may avoid even the possibility of losing their parental rights. On the other hand, indigent parents similarly afflicted must seek aid from public agencies in order to provide for their children. It is indeed ironic that in seeking the only assistance available to them indigent involuntarily incapacitated parents expose themselves to the threat of losing the very reason for the quest for help—their children. Such de facto discrimination on the basis of wealth should be considered by this Court when construing and applying the words of a statute. 1 Pa.C.S.A. § 1921(6) (Supp.1977–78). *See* note 8 *infra*.

ever, the evidence does not support a conclusion that this cause cannot be remedied. To the contrary, there is expert testimony, summarized by the majority, that appellant's I.Q. scores placed her within the category of *educable* and *trainable* mentally retarded. A finding that the cause of appellant's incapacity cannot be remedied could only be sustained by ignoring the psychologist's testimony concerning appellant's capacity for training and education. Nor can it be concluded that the cause of appellant's incapacity will not be remedied. Appellant has, at considerable inconvenience, sought and received the assistance of Children's Services and nutrition aides in order to provide adequate parental care; appellant changed her residence in order to improve her family's living conditions; appellant maintains an adequate and healthful dwelling; and she provides for her daughter's basic needs. The record shows that appellant was more than willing to seek the best possible environment for the rearing of her children and that she possessed sufficient capacity to perform the duties of parenthood. I am therefore of the belief that even without a consideration of the question of "fault" the clear language of section 311(2) does not provide a basis for termination under the instant record.[5]

Even more egregious, in my view, is the majority's position that the element of parental fault is not required by section 311(2). The majority construction of section 311(2) in effect means that an involuntary parental incapacity, sustained through no fault of the parent, if found to be irremediable, justifies judicial termination of the incapacitated parent's parental rights. Such a construction raises serious equal protection questions which may very well render section 311(2) invalid.

5. The record in the appeal of Gladys B. presents a significantly distinguishable factual situation. Appellant Gladys B.'s refusal to cooperate with school counselors and nutrition aides and her open hostility toward caseworkers present a clearer case of an incapacity which "will not be remedied by the parent." Gladys B.'s obstinate unwillingness to accept the assistance offered is but one kind of parental misconduct which is a prerequisite to termination of parental rights under Section 311(2). I therefore concur in the result as to the appeal of Gladys B.

The construction placed upon section 311(2) by the majority results in the creation of two categories of parents; one consisting of involuntarily incapacitated parents, either physically, mentally, or both, and the other consisting of basically healthy parents. As to those parents in the former category, the majority would apply section 311(2) to terminate their parental rights, whereas those parents in the latter category would not face such a threat without some dereliction on their part. By this judgment they have ordained that the bedridden terminally ill cancer patient, the comatose accident victim, the paralytic, and the contagiously ill patient are all prime subjects for involuntary termination under this section.[6]

It is conceded that there are literally hundreds of legislatively created classifications and that the constitutional guarantee of equal protection does not operate as a per se prohibition of such classifications. The traditional equal protection standard required only that the differentiation in treatment created by a classification bear some reasonable relationship to a legitimate legislative objective. *See e. g., Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (Jackson, J., concurring). *See generally, G. Gunther, Constitutional Law* 657 (9th ed. 1975). However, where a statuto-

---

**6.** We who sit as appellate judges must always guard against becoming emotionally isolated from human nature and the human consequences of our decisions lest in our endeavors to render dispassionate justice we lose our compassion. Kafka, in describing judges in a fictional judiciary, wrote:

"... yet confronted with quite simple cases, or particularly difficult cases, they were often utterly at a loss, they did not have any right understanding of human relations, since they were confined day and night to the workings of their judicial system, whereas in such cases a knowledge of human nature itself was indispensable."

F. Kafka, The Trial 148–49 (M. Brod ed. 1969). One cannot ignore the human result of the majority's decision today. In the words of Mr. Justice MANDERINO in his dissent in the instant case, Frank, William and Mark are dead so far as appellant is concerned.

ry classification affects a fundamental interest, equal protection requires that the statutory classification be necessary to promote a compelling state interest. *See Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (right to vote). *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right of interstate travel). The cornerstone of the parental relationship is the natural love that exists where it is properly nurtured by the parent. In the panoply of duties and responsibilities that comprise the obligations of parenthood, nothing is more important than the fostering of the love that can exist between parent and child. No experience in life is more gratifying and significant in the development of the child than to have been the recipient of parental love. The warmth and the security of that love dwarfs the incidental benefits that riches, luxury and power may provide. The societal importance of the parental relationship explains, if such explanation is needed, why the United States Supreme Court has consistently held that the right of natural parents to raise their own offspring is a fundamental interest and thus subject to the highest degree of constitutional protection. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *see Pierce v. Society of Sisters, supra; Meyer v. Nebraska, supra.* Since the classification drawn by the majority's construction of section 311(2) directly impinges upon involuntarily incapacitated parents' rights to the companionship, care and custody of their children, only a compelling state interest can justify the classification. I have grave doubts that the state's admittedly valid interest in protecting minor children is sufficiently powerful to legitimize the classification.[7] Furthermore, I would submit that even if this state interest is considered to be a "compelling" one, there are less drastic alternatives available (e. g., continued foster home care), short of absolute termination of

7. Since, as the majority correctly notes, the appeal of Marjorie L. does not involve any parental misconduct, the "abuse, neglect, or refusal" language of section 311(2) was not a basis for the majority's holding.

parental rights, to promote this state interest.[8] The state's interest is that of insuring that the essential needs of the child are met. In cases involving no parental misconduct, such as the instant case, this interest is sufficiently promoted by custody awards.

I need not reach the ultimate merits of the constitutional issues discussed above, because in my judgment the appropriate construction of section 311(2) avoids constitutional problems. In concluding that the incapacity provisions of section 311(2) do not require any showing of parental fault, the majority relies upon the Joint State Government Commission, Official Comment, Adoption Act (1970). It is, of course, permissible for this Court to consult such comments in construing a statute. 1 Pa.C.S.A. § 1939 (Supp.1977–78). However, in construing a statute, this Court should also consider the consequences of a particular interpretation and should presume that the legislature did not intend that a statute be construed in a constitutionally questionable manner. 1 Pa.C.S.A. §§ 1921(6), 1922(3) (Supp.1977–78). While the words, "incapacitated" and "cannot", when read in conjunction in a purely literal sense, could support the construction urged by the majority, it is my view that such a construction is foreign to the American philosophy of the relationship between the State and the citizen and is totally unwarranted. The majority's no-fault interpretation of the

8. I have already discussed the potential for de facto discrimination on the basis of wealth created by the majority's construction of section 311(2). *See* note 4, *supra.* I now point out that such a wealth-based classification also raises an arguable equal protection question. It must be conceded that the Equal Protection Clause has not been judicially accepted as a means of redressing all economic inequalities. *Compare San Antonio Ind. Sch. Dist. v. Rodriguea,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Texas system of financing public education upheld in face of equal protection attack) *and Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (denial of appellate counsel to indigent criminals held unconstitutional, but opinion unclear as to whether holding relied upon due process or equal protection). Nevertheless, in interpreting a statute, this Court should consider the consequences, both legal and practical, of its interpretation. 1 Pa.C.S.A. § 1921(6) (Supp.1977–78). Certainly there is no justification for a construction, not absolutely required by the language of the act, which would create such a blatant disparity between the rich and the poor.

incapacity provisions of section 311(2) permits the termina-tion of the parental rights of parents who, without any fault, are rendered unable to care for their children. In light of this consequence and the attendant constitutional difficulties, I suggest that some degree of parental fault be a prerequisite to a termination on grounds of incapacity. The "abuse, neglect, or refusal" language of section 311(2) shows that parental misconduct was a primary concern of the legislature. Furthermore, in providing for termination when an incapacity "will not be remedied by the parent", the legislature clearly intended that the willful refusal of parents to take steps to remedy their own incapacity would constitute grounds for termination. Thus, the element of fault, or parental misconduct, permeates section 311(2). Since the state has a much stronger interest in protecting minor children from willful or even negligent parental mis-conduct, the statutory interpretation I proffer is essential if section 311(2) is expected to withstand an equal protection attack.

I therefore dissent as to the termination of parental rights of appellant Marjorie L., and I concur in the result as to the termination of parental rights of appellant Gladys B.

MANDERINO, Justice, dissenting.

I must dissent. The majority holds that the state may constitutionally terminate the parental rights of a parent if that parent, without fault, is incapacitated, and the incapaci-ty prevents the parent from taking care of that parent's children. The state does not have such a dangerous and far-reaching right over its citizens. Suppose a parent is incapacitated, without fault, as the result of an automobile accident, or a heart attack, or an injury received during a war? Under the majority's holding, if such a parent cannot take care of his or her children, the state may terminate parental rights. To state the issue is to answer it. The state can constitutionally have no such right.

We are not in this case concerned with *custody*. Of course, if a parent is incapacitated, a benevolent and protec-

tive state may help that parent by providing care for the children outside of the parent's custody. The termination of parental rights, however, means that the child is dead so far as that parent is concerned. I cannot, as does the majority, make a valued judgment that a child will grow up to be a better adult if that child is cut off from its natural parents who are not able, without fault, to care for the child.