J-S89001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: F.R.P., JR., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| APPEAL OF: F.R.P., FATHER | |
| | No. 1870 EDA 2016 |

Appeal from the Decree May 23, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000920-2015

BEFORE:  SHOGAN, MOULTON, and FITZGERALD, JJ.*

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 30, 2016**

Appellant, F.R.P. ("Father"), appeals from the decree entered on May 23, 2016, that terminated his parental rights to F.R.P., Jr. ("Child"), who was born in June of 2013.[1]  We affirm.

In its Pa.R.A.P. 1925(a) opinion, the trial court set forth the relevant history of this matter as follows:

> On January 11, 2016, this Court held a bifurcated Goal Change/Termination Hearing and heard testimony on [the Department of Human Services' ("DHS")]  Petition to terminate

---

* Former Justice specially assigned to the Superior Court.

[1] The parental rights of Child's mother ("Mother") were terminated in an order that was filed on January 11, 2016.  Based on the record before us, it does not appear that Mother appealed the termination of her parental rights, and she is not a party to the instant appeal.

Father'[s] rights as to [Child], and change the goal to Adoption. Father was present and represented by his attorney.

The Assistant City Solicitor first presented the testimony of Laquisha Henderson, DHS Social Worker. She testified [Child] came into care in November 2013 because of housing issues that prompted DHS to obtain an [Order of Protective Custody ("OPC")] for this family (Notes of Testimony 1/11/2(16, p.9 at 10-23; p.10 at 11-18).

Ms. Henderson testified that at the time DHS obtained the OPC, Father and Mother were residing together in the same home. The home was inappropriate and [Child] was removed because of the structural damage and the house was infested with roaches, and there was very little food. (Notes of Testimony 1/11/2016, p.11 at 19-23; p.12 at 1-5; p.13 at 2-5).

Father's [Family Service Plan ("FSP")] objectives at the time were to fix the house he occupied and to exterminate the roach infestation. DHS assisted the Father with exterminating fees and had contractors come out to assess the home and provide an estimate to fix it. The repairs were never completed on the house, however, there were two treatments by exterminators on the house. Ms. Henderson testified she paid for those two treatments out of her own personal funds because it would have taken a long time to retrieve the funds from DHS. She also testified there were other issues involved, specifically, Father's brother moved into the home and DHS could not clear him. (Notes of Testimony 1/11/2016, p.13 at 24-25; p.14 at 1-25; p.15 at 1-4).

Ms. Henderson stated that from November 2013 through February 2015, the house was never in a condition for reunification, and that Father's other objective to attend doctor's appointments for [Child] was something Father did complete at the time. (Notes of Testimony 1/11/2016, p.15 at 11-22).

She testified Father's visitation with [Child] began as supervised because Mother was residing at the home and she had a history of drug use. Then later the visits were changed to unsupervised, which did not last long because there was an incident where Father could not locate [Child] for over an hour and police were called. The visits were then returned to supervised. (Notes of Testimony 1/11/2016, p.17 at 1-16).

Ms. Henderson testified Father had a psychiatric evaluation and one of the recommendations was that Father have a parenting capacity evaluation. During her tenure as Social Worker, she noted that Father had complied with the first part of that evaluation. (Notes of Testimony 1/11/2016, p.18 at 8-20).

She then referred Father to [the Clinical Evaluation Unit ("CEU")] because there were reports of some drug and alcohol use. Father did report to CEU and no treatment was recommended because his screens were negative. (Notes of Testimony 1/11/2016, p.19 at 1-9).

Ms. Henderson testified she observed three interactions between [Child] and Father, and noted they were positive and they appeared to have a bond. (Notes of Testimony 1/11/2016, p.19 at 13-24).

On cross-examination, Ms. Henderson stated she saw Mother two times at the house. She also stated the main issue with the house was an electrical problem and the contractor believed it was a fire hazard. There was also structural damage in the ceiling in the living room around the front door. (Notes of Testimony 1/11/2016, p.22 at 5-9; p.25 at 4-16).

The next to testify was Crystal Adkins, the [Community Umbrella Agency ("CUA")] Case Manager at Tabor. She received the case in February 2015 and is the current Case Manager for the family. She stated Father's Single Case Plan (SCP) was his [Public Health Management Corporation ("PHMC")] application for his home, attend the visitations, to cooperate with CUA services, have a parenting evaluation, and accommodate [sic] the resource parent to [Child's] doctor's appointments. (Notes of Testimony 1/11/2016, p.27 at 8-25; p.28. at 1-6).

Ms. Adkins stated that even if all the repairs were made in the home, it would still not be appropriate for reunification because of the people living in the home. She visited the home on pop up visits each month from September 2015 through December 2015, and the visits could not be scheduled because the agency lost contact with Father for the month of October 2015. She went to the house and saw various people living in the house, and they had not run clearances on these people. She further stated she had not seen Father in the home since August

2015. (Notes of Testimony 1/11/2016, p.29 at 12-25; p.30 at 1-25; p.32 at 21-25; p.34 at 18-25).

Regarding visitation, Ms. Adkins testified Father made his supervised visits during September and no contact with [Child] in October 2015. (Notes of Testimony 1/11/2416, p.31 at 1-20).

Ms. Adkins testified Father had told her he had a stay-away order against Mother because she was physically violent towards him and he did not want her around the home. Father reported during an unsupervised visit with [Child] he was walking on an avenue and Mother had punched him in the face. (Notes of Testimony 1/11/2016, p.37 at 1-25).

Ms. Adkins discussed [Child's] medical issues, primarily an ear surgery appointment in November 2015, when [Child underwent ear surgery] to resolve his hearing issues. [Child] is scheduled for a follow up in April 2016. She commented that Father was not present to authorize that surgery. She further stated Father was consistent with attending medical appointments for [Child] in August 2015, however did not attend appointments in September 2015. (Notes of Testimony 1/11/2016, p.38 at 1-25).

Ms. Adkins testified that Father first had unsupervised visits with [Child] in February 2015, however, visits were changed to unsupervised biweekly visits at the agency only because there were safety concerns during Father's visits. Father was reported by the resource parent to be drinking, smoking marijuana, and that one of the [m]others of his [c]hildren was allowed into his house. (Notes of Testimony 1/11/2016, p.40 at 8-25; p.41 at 5-10).

Ms. Adkins stated that prior to September 2015 she would have recommended reunification with [Child] for Father, however, since that time Father has been inconsistent with his parenting. Father always seems to need DHS assistance. (Notes of Testimony 1/11/2016, p.43 at 4-15).

She testified [Child] identifies the resource parent as his [parent]. [The resource parent and Child] are bonded because [Child] responds to her directives regarding bathing, eating, and embraces her during visits from the agency. Since the ear operation, [Child] hears better and speaks better. The resource

mother speaks Spanish to him and he runs to her and embraces her. She keeps up with the Child's medical [needs], keeps his hair cut and well-groomed, and he has good hygiene. (Notes of Testimony 1/11/2016, p.46 at 1-22; p.47 1-11).

Ms. Adkins' [sic] stated the resource mother is willing to adopt [Child] and she last saw [Child] on 12/26/2015, and he was safe and his needs were being met. It is Ms. Adkins' opinion is [sic] that it is in the best interests of the Child to be adopted. She further opines that [Child] would not suffer irreparable harm if Father's parental rights were terminated because she believes [Child] is not bonded to the Father. (Notes of Testimony 1/11/2016, p.47 at 12-22; p.50 12-20).

On May 23, 2016, this Court continued the testimony in the Goal Change/Termination Hearing and heard testimony on DHS's Petition to terminate Father's rights as to [Child], and change the goal to Adoption. Father was present and represented by his attorney. (Notes of Testimony 5/23/2016, p.3 at 12).

The Assistant City Solicitor first presented the testimony of Dr. Erica Williams, Forensic Mental Health Services, as an expert in the field of Parenting Capacity Evaluations. Dr. Williams testified she performed a parenting capacity evaluation on Father in January 2016. She testified the parent is brought in to complete their intake paperwork and an MMPI 2, the Minnesota Multiphasic Personality Inventory, Second Edition, and the parent is advised to provide any of their own materials they would like reviewed. She met with the Father and received updated information from the current management agency. (Notes of Testimony 5/23/2016, p.18 at 12-25; p.19 at 4-25; p.20 at 1-12).

Dr. Williams testified the result of her assessment of Father was that he did not present with the capacity to provide safety or permanency at the time for [Child]. She testified the factors that led to her conclusion … included Father's pattern of not being able to meet [Child's] needs. There were factors of deplorable housing, and lack of food. And this was despite being provided supportive services, financial services, and having somebody coming to the home and help them to remedy the conditions. Father violated safety plans to include bringing [Child] to his home when he was not supposed to, allowing

[Mother] around [Child] when he was not supposed to, and there were multiple sources communicating that Father was abusing substances. Although Father denied substance abuse, there was a prior psychological evaluation completed where Father reported alcohol abuse. Dr. Williams opined that Father's disconnect on the alcohol abuse was also concerning. (Notes of Testimony 5/23/2016, p.21 14-25; p.22 at 9-25; p.23 at 1-13).

Dr. Williams also testified Father was able to describe the reasons that [Child] had come to care, but he was not able to identify or acknowledge a role that he played in [Child] coming into care. He believed that each of the events were the result of behaviors of others, and he identified more of a passive being to [Child], rather than an active parent who could assert any control over the situation, and that was a factor in the assessment that he was not able to provide safety or permanency. (Notes of Testimony 5/23/2016, p.24 at 1-16).

Dr. Williams further testified that Father reported to her there was a restraining order against [Child's] Mother, and that she was present in his home, and because he allowed it to happen and it violated the safety plan[, it] was a factor in the assessment also. She stated Father has a pattern of passivity. Things occur kind of around him and to him, rather than him enacting things in his environment. There were concerns with borderline intellectual functioning and a possible cognitive limitation. (Notes of Testimony 5/23/2016, p.26 at 1-19).

Father provided two versions to Dr. Williams regarding people living in his home. First he stated that he was living alone, then later he stated there were other people living in his home, but he did not identify them and stated they would be leaving shortly. Father was unable to understand how that impacted the reunification [with Child]. Dr. Williams opined that there is a concern that those around Father may be taking advantage of him, maybe doing things that are not in his best interest, and he is not necessarily aware that this is happening to him. It then becomes a larger concern that he does not have an effective role in his life and really cannot effect a role in [Child's life] until he is able to have one on his own life. (Notes of Testimony 5/23/2016, p.27 at 13-25; p.28 at 15-25).

Dr. Williams opined that although she recommended Father get frequent and random drug tests, she noted that

assuming Father did provide clean drug screens, the substance abuse was an additional concern to those already addressed, and more recommendations would need to be put in place and other possible services arranged that could help Father gain the capacity to be a parent. (Notes of Testimony 5/23/2016, p.29 at 18-25; p.30 at 1-2).

When questioned by the Child Advocate, Dr. Williams noted that Father understood he had violated the safety plan by allowing Mother to be in his home. Father violated the plan despite knowing that [it was] in place to protect [Child]. That feeds into the concern that Father is not able to affect safety for [Child]. (Notes of Testimony 5/23/2(16, p.31 at 1-17).

On cross-examination by Father's attorney, Dr. Williams noted that the date of Father's evaluation was January 8, 2016. Father's counsel noted that the diagnosis stated, 'R/O intellectual inability,' which the Doctor explained that when diagnosing a client, when there is sufficient information to know that it is going in a direction but not enough to make a diagnosis, you make a rule-out, with follow-up recommendations, to establish whether it exists or not. So based on the I.Q. from Dr. Glick, there is a likelihood that Father has a mild intellectual disability. One of the recommendations was to pursue intellectual disability services to rule out whether that was something that existed for him. (Notes of Testimony 5/23/2016, p.31 19-25; p.32 at 1-4; p.35 at 1-25; p.36 at 1).

Father was the final witness to testify during the hearing. He stated he is currently living alone in his three bedroom rowhome, and that he has a crib and other things ready to take care of [Child]. (Notes of Testimony 5/23/2016, p.42 at 3-22).

Father stated he missed mental health appointments because the counselor is on maternity leave and he has been attempting to get in touch with her. (Notes of Testimony 5/23/2016. p.44 at 10-25).

Father testified that when the baby came home there were no roaches, and stated he worked and it was Mother's responsibility to clean the house, but she did not want to do that. Father admitted Mother appeared at his door when he was barbequing and he called the police because she was violating

the restraining order, but she left before the police arrived. (Notes of Testimony 5/23/2016, p.49 at 1-18).

Father admitted his brother, who had a criminal record, was living in his home, as well as two other individuals. These people did not pay him rent, and they were to be there only 30 days, however, they stayed on until April 20th. Father admitted Ms. Adkins had warned him that these people should not be living in the home. (Notes of Testimony 5/23/2016, p.50 at 1-14; p.52 at 2-25; p.52 at 1-10).

Trial Court Opinion, 8/15/16, at 11-19.

On May 23, 2016, the trial court terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), and it concluded that termination of Father's parental rights serves Child's best interests pursuant to 23 Pa.C.S. § 2511(b). This timely appeal followed.

On appeal, Father raises the following issues for this Court's consideration:

A. Whether The Trial Court Erred In Involuntarily Terminating The Father's Parental Rights Where It Was Not Supported By Clear And Convincing Evidence When The Father Completed A Substantial Portion Of His FSP/SCP objectives?

B. Whether The Trial Court Erred In Involuntarily Terminating The Father's Parental Rights Where The Father Had Consistently Visited [Child] and There Was A Bond Between The Father and Child and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of [Child]?

C. Whether The Trial Court Erred in Finding the Bonding Evaluation Credible Where the Evaluator did not have complete information, and did not observe the father and [C]hild together?

Father's Brief at 5.[2]

In reviewing an appeal from an order terminating parental rights, we

adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an

---

[2] We have renumbered Father's issues for purposes of our discussion.

error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Father's first issue challenges the trial court's findings with respect to 23 Pa.C.S. § 2511(a). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We focus our analysis on sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

- 10 -

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but under section 2511(b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). For purposes of this appeal, we first analyze this case under 23 Pa.C.S. § 2511(a)(2), then under 23 Pa.C.S. § 2511(b).

Our Supreme Court set forth the proper inquiry under section 2511(a)(2) as follows:

[Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

[The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):

- 11 -

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986), *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*Adoption of S.P.*, 47 A.3d at 827.

This Court has stated that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*. at 340.

The trial court provided the following rationale:

> After hearing the credible testimony of [Ms.] Laquisha Henderson, DHS Social Worker, Crystal Adkins, CUA Tabor Social Worker Service Manager, and Dr. Erica Williams, with Forensic Mental Health Services, the Court found by clear and convincing evidence, that their observations and conclusions regarding Father's lack of ability to fulfill his parental responsibilities were persuasive.

> Father has been unable to provide food, clothing and housing that was free from roach infestations to assure the safety of [Child]. Testimony showed that Father was unable to exercise sound judgment in allowing [Mother] to enter into his home when she was prohibited from contact with him because of a safety plan and a restraining order. He also exercised poor

judgment in allowing his brother and two strangers to live in his house, knowing that they had questionable criminal backgrounds and posed a safety threat to [Child].

Trial Court Opinion, 8/15/16, at 21.

Father argues that he "substantially completed" the goals set in the FSP and the individual service plan objectives. Father's Brief at 13. We agree that Father initially made some strides towards compliance. Nevertheless, Father's housing situation remains inappropriate, and there was evidence that Father's efforts to remedy the conditions leading to Child's removal waned in tandem with Father's increased substance abuse. N.T., 5/23/16, at 23. Thus, we conclude that Father's argument lacks merit, and there was no error in terminating Father parental rights under section 2511(a)(2). *Adoption of S.P.*, 47 A.3d at 826-827.

In his remaining issues, Father challenges the trial court's findings with respect to the absence of a bond between Father and Child under 23 Pa.C.S. § 2511(b). Our Supreme Court has held:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We have stated that, in conducting a bond analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has also observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). In addition, it is appropriate to consider a child's bond with their foster parents. *T.S.M.*, 71 A.3d at 268.

Furthermore, in *T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bond between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court stated the following:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g.,* [*In the Interest of*] *R.J.T.*, 9 A.3d [1179,] 1190 [(Pa. 2010)] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a

child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.*, 9 A.3d at 1186; *In re Adoption of S.E.G.*, 901 A.2d [1017,] 1019 [(Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See*, 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

*T.S.M.*, 71 A.3d at 268-269.

Herein, the trial court considered the needs and welfare of Child and

concluded as follows:

The Court heard testimony that the resource mother is willing to adopt [Child] and that [Child] was safe and his needs

were being met in this home. Testimony was presented that showed that it is in the best interests of [Child] for him to be adopted. Further, credible testimony was presented that [Child] would not suffer irreparable harm if Father's parental rights were terminated because [Child] is not bonded to Father.

Trial Court Opinion, 8/15/16, at 22. Since before his first birthday, Child has been in the custody and care of the resource mother. N.T., 1/11/16, at 22. Furthermore, to the extent Father suggests that there is some bond between him and Child, we conclude that while Father had made some efforts to remedy the situation that led to Child's removal, any bond is tenuous at best. Father is "unable to satisfy the irreducible minimum requirements of parenthood." *See In re T.D.*, 949 A.2d 910, 920-923 (Pa. Super. 2008) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving parental rights would only serve to prevent T.D. from being adopted and attaining permanency).

In *Z.P.*, we held that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Z.P.*, 994 A.2d at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Again, as the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to section 2511(b). **Adoption of S.P.**, 47 A.3d at 826-827. Accordingly, we affirm the trial court's order terminating Father's parental rights.

The evidence reveals that the conditions which led to Child being removed from the home, including allowing potentially dangerous and prohibited persons inside the home, continue to exist. Father is either unwilling or unable to appreciate the gravity of his failure, the issues this situation creates, and the deleterious effects on Child. While Father admittedly tried and had some early success with efforts to rehabilitate, the factors that led to Child's removal remain, and Father has failed to remedy these conditions. We conclude that the record supports the trial court's factual findings, and those conclusions are not the result of an error of law or an abuse of discretion. **Adoption of S.P.**, 47 A.3d at 826-827. Accordingly, it was proper for the trial court to conclude that no bond exists such that Child would suffer harm if Father's parental rights were terminated. This Court finds no abuse of discretion in the trial court's termination of Father's parental rights to Child pursuant to section 2511(b).

For the reasons set forth above, we conclude that Father is entitled to no relief. Accordingly, we affirm the trial court's decree involuntarily

terminating Father's parental rights under section 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/30/2016