J-S19011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.B. AND M.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B. | : | No. 1762 MDA 2016 |

Appeal from the Decree Entered October 7, 2016
In the Court of Common Pleas of Huntingdon County
Orphans' Court at No(s):  31-16-0025,
31-16-0026

BEFORE:   GANTMAN, P.J., BENDER, P.J.E., and STEVENS, P.J.E.*

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MARCH 20, 2017**

Appellant, A.B. ("Mother"), appeals from the decree entered in the Huntingdon County Court of Common Pleas Orphans' Court, which granted the petitions of the Huntingdon County Children's Services ("Agency") for involuntary termination of Mother's parental rights to her minor children, M.B. and M.M. ("Children").  We affirm.

In its opinion, the Orphans' Court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[1]

---

[1] Despite the court's entry of a single termination decree, which terminated Mother's rights to both M.B. and M.M., we observe that it was improper for Mother to file a single notice of appeal and statement of errors complained of on appeal.  **See** Pa.R.A.P. 341 (providing that where one or more orders resolves issues arising on more than one docket, or relating to more than
*(Footnote Continued Next Page)*

---

*Former Justice specially assigned to the Superior Court.

Mother raises five issues for our review:

> WHETHER...[THE] COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [MOTHER] IN REGARDS TO [CHILDREN?]
>
> WHETHER...[THE] COURT ERRED IN FINDING THAT THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE THAT MOTHER...EVIDENCED A SETTLED PURPOSE OR INTENT TO GIVE UP OR FAILED TO PROVIDE PARENTAL DUTIES FOR THE SIX MONTHS IMMEDIATELY PRECEDING THE FILING OF THE PETITION[?]
>
> WHETHER...[THE] COURT ERRED IN FINDING THAT [MOTHER] COULD NOT WITHIN A REASONABLE TIME CORRECT ANY DEFICIENCIES THAT CAUSED THE PLACEMENT OF CHILDREN[?]
>
> WHETHER...[THE] COURT ERRED IN FINDING THAT THE CONDITIONS WHICH LED TO THE REMOVAL OR PLACEMENT OF [CHILDREN] CONTINUED TO EXIST AND TERMINATION OF PARENTAL RIGHTS WOULD BEST SERVE THE NEEDS AND WELFARE OF [CHILDREN][?]
>
> WHETHER...[THE] COURT ERRED BY ASKING QUESTIONS CONCERNING AN EVICTION OF [MOTHER] IN AN UNRELATED MATTER THAT [THE COURT] PRESIDED OVER AND WHICH AN AGREEMENT WAS ENTERED CONCERNING AN EVICTION ACTION AGAINST [MOTHER?]

(Mother's Brief at 4-5).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent

*(Footnote Continued)* ————————————

one judgment, separate notices of appeal are required). Nevertheless, we decline to reject Mother's appeal on this basis.

evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

***In re Z.P.***, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting ***In re I.J.***, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. ... We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> ***In re B.L.W.***, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> ***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191-92 (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d

1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Agency filed petitions for the involuntary termination of Mother's parental rights to Children on the following grounds:

### § 2511.  Grounds for involuntary termination

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to

the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of...her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to

- 5 -

perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for…her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

[T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of…her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the

following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the

bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, *supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable George N. Zanic, we conclude Mother's issues merit no relief. The Orphans' Court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Orphans' Court Opinion, filed November 17, 2016, at 5-12) (finding: throughout dependency hearings, Agency was concerned with Children's medical neglect, lack of supervision, and home conditions; Mother waited several days to obtain necessary medication [for M.B.'s pneumonia]; Mother did not properly treat Children's lice for extended time; Mother ignored many safety concerns; Mother's home conditions also created health

and safety risk to Children; caseworkers observed, *inter alia*, sink used as garbage can, spilled ash trays, dirty diapers lying around home, bathtub filled with water, knives and razors left out, food left on floor, and child safety gates left open; Mother failed to maintain home improvements; as of June, 2016, caseworker noted health and safety concerns continued in Mother's home; caseworkers went above and beyond to assist Mother for almost 18 months, but Mother still lacks ability to establish safe and healthy environment for Children; Mother did not believe Children were in danger in her home; termination of Mother's parental rights was proper under Sections 2511(a)(1), (5), and (8); under Section 2511(b), Children were not upset to return to foster home after their visits with Mother ended; Children have extremely close bond with foster parents; severing bond with Mother is in Children's best interests; Children deserve permanency and healthy environment, which Mother is incapable of providing; regarding Mother's claim that court improperly questioned Mother about eviction proceedings, Mother's eviction was previously addressed during dependency proceedings, which are incorporated into record; permanency review orders stated Mother voluntarily agreed to move out of public housing after receiving eviction notice due to home conditions; court addressed eviction proceeding, but only considered it minimally relevant). Accordingly, we affirm on the basis of the Orphans' Court opinion.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/20/2017

IN THE COURT OF COMMON PLEAS OF HUNTINGDON COUNTY,
PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:    M.B.              :      No. 2016-0025
          DOB: 12/   /2013 :
                           :
IN RE:    M.M.              :      No. 2016-0026
          DOB: 4/   /2012  :

## MEMORANDUM

After hearing held on October 5 and 6, 2016, pursuant to a Petition to Terminate Parental Rights, this Court was tasked with determining whether Petitioner had established by clear and convincing evidence that Appellant's (hereinafter "Natural Mother") parental rights with respect to M.M. and M.B. should be terminated. On October 7, 2016, we entered a decree terminating the parental rights of Natural Mother. We now write to fulfill our duties pursuant to Pa.R.A.P. 1925(a).

Natural Mother's Concise Statement of Matters Complained raised five issues that are related to the termination proceedings, which are: (1) this Court erred in terminating the parental rights of Natural Mother, (2) this Court erred in finding the Agency presented clear and convincing evidence of a settled intent to give up six months prior to filing the petition, (3) this Court erred in finding that Natural Mother could not correct any deficiencies in a reasonable time, (4) this Court erred in finding the conditions that lead to removal continue to exist and termination of parental rights would best serve the needs and welfare of the children, and (5) this Court erred by asking questions about an eviction of Natural Mother in unrelated matter that he presided over in which an agreement was entered concerning an eviction action.

## Background

1.       A.B.          ("Natural Mother") is the natural mother of minor children M.B. and M.M.

1

2. K. G. is the natural father of M.B.

3. C.J. M. · is the natural father of M.M.[1]

4. On March 17, 2015, Huntingdon County Children's Services ("Agency") filed an Emergency Protective Custody Petition[2] and the Court issued an Emergency Protective Custody Order on the same day based on deplorable home conditions and medical neglect.

5. The March 17, 2015, Order also placed the children in an Agency-approved foster home.

6. The children were declared dependent on March 27, 2015, and remained in foster care.

7. On March 18, 2015 during a shelter care hearing Bobbi Jo Snyder, a CYS Agency in-take caseworker, described the home conditions in January 2015. There was food on the floor, dishes piled in the sink, and garbage piled up. The caseworker described the home from the most recent visit in March as messy but there were improvements.

8. During the same hearing, Sarah Shope, a family preservation and reunification caseworker, went to the home about sixteen times between January and March 2015.

9. Shope gave Natural Mother instructions on maintaining the home. Shope also purchased cleaning supplies, and helped Natural Mother clean the home. In her opinion, prior to the removal of the children, the home conditions were not improving.

10. In the permanency petition filed on May 12, 2015, the Agency alleged that since the last hearing, Natural Mother had been offered family reunification and parenting classes.

11. In the permanency review Order filed September 4, 2015, Natural Mother declined individual counseling that was recommended by the Agency. At that time, services were being provided to the family.

12. The permanency review Order filed November 6, 2015 found that Natural Mother had minimal compliance with the permanency plan, the home conditions deteriorated due to regression, and natural mother was not receptive to alleviating these issues within a reasonable period of time. Services continued to be provided to the family.

---

[1] The Court has been advised that the Natural Fathers have indicated a desire to voluntarily terminate their parental rights at the conclusion of the termination of Natural Mother's rights.

[2] We have incorporated the Huntingdon County dependency actions captioned to CP-31-DP-19-2015 and CP-31-DP-20-2015.

2

13. The permanency review Order filed February 12, 2016 found that Natural Mother was moderately compliant with the permanency plan but she had been less cooperative with the caseworker and missed appointments. Services continued to be provided to the family.

14. The permanency review Order filed June 3, 2016 found that Natural Mother voluntarily agreed to move out of the public housing by July 24, 2016. Natural Mother's supervised visits were moved from Raystown Developmental Services ("RDS") to the home. Services continued to be provided to the family.

15. Sarah Shope discussed working on this case from January 2015 to January 2016.

16. Shope described the initial home conditions as "unsanitary" and "filthy."

17. Shope listed specific examples that included the sink being used as a garbage can, sheets soiled with urine, ash trays spilled, dirty bathroom, no toilet paper, and used dirty diapers on the floor.

18. Shope stated the medical neglect concern regarded lice being a problem for an extended period of time, and Natural Mother not picking up prescribed medication for the children for several days.

19. The lice problem stopped after placement of the children in foster care.

20. RDS had supervision concerns because there were reports that Natural Mother was leaving the children unsupervised in the apartment or allowing the children to access the upstairs and downstairs of the apartment while she slept.

21. Shope continued to check in daily to either make sure the cleaning was completed or to remind Natural Mother to clean.

22. During January 2015 to March 2015, Shope was at Natural Mother's home four to five times each week.

23. Shope made a report to the Agency in March 2015 based on Natural Mother not improving enough and the children being unsafe.

24. Shope testified regarding knives laying out, a bathtub full of water, and the gate not being utilized as examples of safety concerns.

25. Natural Mother's visits increased and decreased during the dependency case.

3

26. Shope took pictures from September 2015 to January 2016 that showed the deplorable conditions of the home. The most recent pictures showed safety risks, such as scissors and razors within the children's reach.

27. Jackie Garman, a family reunification and preservation caseworker at RDS, has been assigned to the case since January 18, 2016.

28. Natural Mother had two overnight visits per week in January 2016, however, in February 2016 the visits were decreased to two hours of supervised visits each week.

29. The change from home visits to supervised visits were due to home conditions.

30. Garman's initial concerns were mainly home conditions. She saw a child's diaper soaking wet, crib sheets were soiled, toilets were not flushed, and food was on the floor.

31. Garman would go over parenting packets and model the "potty" training techniques and dealing with stress.

32. Garman noticed that she would point out troubling items (i.e. food or a razor on the floor) and it would be picked up within a day or two.

33. Garman took pictures on January 19, 2016, January 26, 2016, February 2, 2016, April 11, 2016, May 18, 2016, and June 21, 2016 that showed Natural Mother's intolerable home conditions.

34. Garman discussed the home improvement issues in the photos and what would need to be corrected.

35. Garman described the home conditions from the April 2016 visit that consisted of a garbage can overflowing with trash, a razor was still in the reach of the children, the sink was piled with dishes, and the toy room was dirty.

36. Garman described the home conditions in May 2016 as dirty and messy conditions.

37. Garman described the home conditions in June 2016 as messy and unsanitary.

38. Garman discussed the problem areas in the home with Natural Mother.

39. In regard to home conditions, Natural Mother would progress and then regress. There was never a time that Natural Mother continued to follow through with clean home conditions, and the improvement was never substantial.

4

40. Home conditions improved from January 2016 to June 2016, but never to the point of Garman having no concerns.
41. Garman saw a bond between the children and their foster family.
42. Garman observed the bond and interactions between Natural Mother and the children. They were happy to see her, but they also did not get upset to leave Natural Mother.
43. Garman did not observe home conditions issues in July at Natural Mother's new residence (with her mother).
44. Trista Mitchell is the Family Services Director at RDS and she supervised both Sarah Shope and Jackie Garman.
45. Mitchell testified that the reunification program is usually six months with the goal to return the children or find permanency.
46. This case had been on a reunification track the entire time, and it went longer than six months due to the periodic progress.
47. Mitchell testified that Shope went "above and beyond" to reunify Natural Mother with children.
48. Barbara Ross, a Foster Care Specialist at the Bair Foundation, saw an extremely close bond between the foster parents and the children.
49. Sabrina Peters, a supervisor at Huntingdon County CYS, testified that CYS cannot place children in a non-approved foster care home. Natural Mother did not provide a name of an approved foster care kinship option.
50. Despite evidence to the contrary, Natural Mother did not believe her children were in danger while living in her home.

## Discussion

Section 2511 of the Adoption Act governs the termination of parental rights. In re L.M., 923 A.2d 505, 511 (Pa. Super. Ct. 2007). Courts utilize a bifurcated analysis which begins with a focus on the conduct of the parties. Id. If the party seeking a termination proves by clear and convincing evidence that the parent's conduct would satisfy one of the grounds for termination listed in Section 2511(a), only then does a court continue with the second part of the analysis under Section 2511(b)[3] and determine the

---

[3] 23 Pa.C.S. § 2511(b) provides:

5

needs and welfare of the child using the best interests of the child standard. Id. A key feature of Section 2511(b) analysis is determining the emotional bond between the parent and child and examining the effect of severing the bond would have on the child. Id.

Here, the Agency seeks to terminate parental rights on any one of three alternative theories pursuant to the termination of parental rights statute:

(a) *General rule.* — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

---

**Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

6

**(8)** The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511.

The Superior Court only needs to agree with the trial court's decision on one of the statutory grounds in Section 2511(a) in order to affirm the termination of parental rights. In re B.L.W., 2004 PA Super 30, P11, 843 A.2d 380, 384 (Pa. Super. Ct. 2004). We find that the Agency has presented sufficient evidence as to all three sections in regard to Natural Mother.

To satisfy the requirements of **Section 2511(a)(1)**, the petitioning party does not need to show a settled purpose of relinquishing the parental claim and a failure to perform parental duties. In re C.M.S., 2003 PA Super 292, P11, 832 A.2d 457, 462 (Pa. Super. Ct. 2003) (quotation omitted). The Pennsylvania Supreme Court has discussed parental duties, stating:

> [t]here is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, our courts have held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

In re C.M.S., 832 A.2d 457, 462, 2003 PA Super 292, P13 (Pa. Super. Ct. 2003) (citation omitted).

7

Furthermore, the Superior Court has noted that "'[a]lthough it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.'" In re of K.Z.S. , 2008 PA Super 62, P7, 946 A.2d 753, 758 (Pa. Super. Ct. 2008)

To satisfy the requirements of **Section 2511(a)(5)**, the moving party must produce clear and convincing evidence regarding the following elements: (1) the child was removed from parental care for at least six months; (2) the conditions that led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions that were the reasons for the removal or placement within a reasonable period time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. In re Adoption of M.E.P., 2003 PA Super 210, 825 A.2d 1266, 1273-74 (Pa. Super. 2003) (citation omitted).

When addressing **Section 2511(a)(8)**, we apply the following standard, which is:

> (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section (a)(8) sets a 12 month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12 month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [agency] services.

8

In re K.Z.S., 2008 PA Super 62, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

The trial court must consider the "developmental, physical and emotional needs and welfare" of the children only after the statutory requirements of Section 2511(a) are met. 23 Pa.C.S. § 2511(b). In re C.M.S., 884 A.2d 1284, 1286-87, 2005 PA Super 340, P7 (Pa. Super. Ct. 2005). With this type of analysis, the court will consider the "[i]ntangibles such as love, comfort, security, and stability." Id. The court will look at the nature and status of the parent-child bond, and focus on the effect of the child being permanently severed from that bond. Id.

Throughout the dependency hearings, the Agency had concerns about the home conditions, medical neglect, and supervision. The medical neglect issues included not picking up medication and the children having lice for an extended period of time. Although Natural Mother took steps to stop the lice, they were ultimately ineffective and allowed for the lice to remain an issue for weeks. The caseworkers had supervision concerns with the children going upstairs and downstairs while Natural Mother was sleeping.

Natural Mother's home conditions were not just messy, they created a health and safety risk to the minor children. In January 2015, the initial review of home conditions included trash piled up, dishes in the sink, and food on the floor. Sarah Shope, the RDS caseworker, spent a year on the case. She described the home conditions as "unsanitary." The sink was used as garbage, the ash trays spilled, and there were dirty diapers laying around the apartment.

From January 2015 to March 2015, Sarah Shope was going to the home four to five times each week to give Natural Mother suggestions and assistance. She did not believe there was improvement because the home conditions continued to be a risk to the children. In March 2015, months after first assisting Natural Mother, Shope saw a lot of safety concerns in the home—a bathtub filled with water, knives left out, and the children's safety gate not being used. When asked about the time she worked on the case, Shope described Natural Mother as having brief periods of progress followed by regress.

9

Jackie Garman, the caseworker assigned in January 2016, said there was progress but it was not substantial and the house was never completely clean. Shope and Garman took pictures of the home conditions and went through every problem with the Natural Mother. The most recent photographs and visit in June had the same sanitary issues. Natural Mother would respond with excuses and she lacked follow through. The reason the overnight visits with the children were stopped was due to the home conditions. Natural Mother's habitual tendencies caused the deplorable home conditions and that environment continued to pose dangers to the children.

As such, the Agency has presented by clear and convincing evidence that satisfy the requirements of section 2511(a)(1), (a)(5), and (a)(8). When children are placed in foster care, the parent has an affirmative duty to work towards the return of the children. In re William L., 477 Pa. 322, 333, 383 A.2d 1228, 1233 (Pa. 1978). Throughout the dependency litigation and termination hearing, Natural Mother failed at affirmatively taking steps when seeking the return of her children.

The evidence shows that pursuant to Section 2511(a)(1), the natural mother's conduct that initially led to placement has continued for a period of at least six months due to a failure to perform parental duties. We have considered the entire history of the case, and Natural Mother does not have the ability to establish a safe and healthy environment for her children.

Natural Mother's home conditions have been a constant concern to the Agency. She has not shown the ability to maintain a safe environment for her children. Since January 2015, RDS and the Agency have provide services to Natural Mother. At one point, the caseworker was going to Natural Mother's house four to five times a week to assist and teach her about proper home upkeep. Social workers went above and beyond their duties to help Natural Mother, and they never saw more than a slight and periodic improvement. There was never a time when Natural Mother maintained improvements for an extended period of time or the improvements would be considered substantial.

10

Even though Natural Mother moved back in with her own mother in July 2016[4], Natural Mother has never shown that she developed the necessary skills for keeping a safe home. Even more disturbing, upon reflection, Natural Mother still does not believe her children were in danger at her residence. The initial home conditions were such a concern that it led to the removal and placement of the children.

As addressed above, pursuant to Section 2511(a)(5), the conditions that led to the removal of the children continue to exist, and the Natural Mother will never be able to remedy the conditions which led to the removal, even within a reasonable time period. The Agency has provided Natural Mother with months of social services.

In fact, the Agency spent extensive time, well beyond the usual six months, with Natural Mother on the reunification goal. Even if Natural Mother was given a reasonable time period, it would be futile in resolving the underlying concerns. Natural Mother's inability to provide a safe and healthy environment for the children is an issue that has never been resolved. The children were removed over eighteen months ago, and the services have been available to Natural Mother since the beginning of the dependency case. The most troubling aspect of this case is that the home conditions have been the crux of removing the children and reducing overnight visits, but still Natural Mother has failed to take the appropriate steps to maintain a healthy environment for the children. Natural Mother would argue that her new residence with her mother shows improvement, but actually it demonstrates that she cannot handle the situation without assistance from others.

As to Section 2511(a)(8), the children have been removed over twelve months, and the conditions that led to the removal are still present. The termination of the parental rights would best serve the needs and

---

[4] Natural Mother raises the issue that this Court erred by addressing an eviction proceeding against Natural Mother in a separate proceeding. Natural Mother's eviction was previously addressed during the dependency proceedings that are incorporated into this record. The permanency review Orders state that "[n]atural mother voluntarily agreed to move out of (public housing) by July 24, 2016" and "natural mother received an eviction notice from housing due to home conditions in May 2016, she chose to leave the residence voluntarily and is now living with her mother." See June 3, 2016 Permanency Review Order and November 4, 2016 Permanency Review Order. This Court addressed the eviction proceeding, but only considers it relevant to the extent that Natural Mother was voluntarily removed from public housing due to eviction proceedings.

11

welfare of the children. Natural Mother cannot meet the necessary home conditions, and the children require permanency with a safe and stable environment. Natural Mother has been given every opportunity to remedy the home conditions, but she has never demonstrated the necessary parenting skills. Even as recently as of June 2016, there were still health concerns in Natural Mother's home.

Because Section 2511(a) has been established by clear and convincing evidence, the Court must now consider the "developmental, physical and emotional needs and welfare" of the children. 23 Pa.C.S. §2511(b). Natural Mother testified that she loves her children, and maternal grandmother described that relationship as a "strong bond." This Court believes that Natural Mother loves these children. However, after the visits with Natural Mother, the children were not upset to return back to their foster home. Although it is always a difficult decision to sever a natural parent-children bond, the testimony at the termination hearing shows that it is the necessary course of action. It is in the children's best interest to sever the bond. These children require permanency and a healthy environment, and unfortunately, Natural Mother is incapable of providing such an environment.

BY THE COURT,

George N. Zanic, P.J.

12

IN THE COURT OF COMMON PLEAS
HUNTINGDON COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In Re:                          File No.:

M. B.                           **31-16-0025**

M. M.                           **31-16-0026**

## NOTICE BY CLERK OF THE ORPHANS' COURT

**TO:**                                 **VIA:**

**Ray A Ghaner, Esq**                   **Courthouse Mailbox**

**Nicholas Newfield, Esq**              **Courthouse Mailbox**

**Christopher Wencker, Esq**            **Courthouse Mailbox**

**Phillip O. Robertson, Esq**           **USPS**

**109 Byron Ave., Altoona, PA  16602**

Pursuant to Pa. O.C. Rule 4.6, notice is hereby given that the attached
Memorandum has been entered and filed of record 17th day of  November, 2016.

BY:

_Virginia Cooper_
VIRGINIA COOPER